940 F.2d 1429
 56 Fair Empl.Prac.Cas. 1233,
57 Empl. Prac. Dec. P 41,028
Alice N. WILSON, Plaintiff-Appellee, Cross-Appellant,
v.
S & L ACQUISITION CO., L.P., Defendant-Appellant, Cross-Appellee.
Alice N. WILSON, Plaintiff/Counterclaim-Defendant-Appellee,
Cross-Appellant,
v.
SELIGMAN & LATZ, INC., d/b/a S & L Acquisition Company, L.P.,
Defendant/Counterclaim-Plaintiff-Appellant, Cross-Appellee.
 No. 89-7764.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 4, 1991.
 
 Joe C. Ashworth, Josie A. Alexander, Jackson, Lewis, Schnitzler & Krupman, Atlanta, Ga., for defendant-appellant, cross-appellee.
 G. Danie Evans, Birmingham, Ala., for plaintiff-appellee, cross-appellant.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 In these cross-appeals the plaintiff-appellant,[1] Alice E. Wilson and the defendant-appellee, Seligman & Latz, Inc.,[2] challenge a judgment arising out of an age discrimination suit and a fraud action filed in the United States District Court for the Northern District of Alabama. Because we find that the district court made certain oral findings at the conclusion of a hearing on post-judgment motions of both parties and then substantially changed those rulings to Wilson's detriment in its later written order, we reverse and remand for further proceedings.
 
 I.
 
 2
 Alice Wilson was born March 1, 1927, in Birmingham, Alabama. She graduated from high school in 1945 and during the same year obtained her license as a beautician. For a number of years, she either owned her own beauty salons or sold beauty products for various cosmetic companies.
 
 
 3
 S & L, as it relates to this case, was comprised of four semi-autonomous divisions. In this litigation we are concerned only with the affairs of the beauty division, Essanelle. Essanelle operated beauty salons in leased space in department stores throughout the country. Administratively, this division of S & L was divided into five geographic regions. In addition to these regional accounts, Essanelle also operated a number of national "accounts" that were on the same footing with the regional accounts. Each regional area was supervised by a vice president who, in turn, reported to the president of Essanelle. Below the level of regional vice president was that of group supervisor who managed the salons housed in the various branches of a particular department store chain. Below the position of group supervisor was the assistant group supervisor and then the individual salon managers.
 
 
 4
 Wilson was hired during the summer of 1984 as the assistant group supervisor for the salons located in the Pizitz department stores in Alabama. This group was one of several that comprised Essanelle's southeastern region. At the time Wilson was employed, the post of group supervisor at Pizitz was vacant. In January, 1985, she was promoted to group supervisor. With this promotion, she received an annual salary of $25,000.00 plus other corporate benefits including health insurance and vacation pay.
 
 
 5
 Shortly thereafter, in March, 1985, Carol Cona, the southeastern regional vice president, began negotiating with a well known Birmingham hair stylist, John Brown, for the position of group supervisor for the Pizitz stores. Her interest in Brown as the Pizitz supervisor was his name recognition and his extensive media contacts in the Birmingham area. She felt that his promotional skills would greatly increase profitability of the Pizitz salons. He was eventually hired in May, 1985, at a salary of $35,000.00 per year.
 
 
 6
 When Wilson heard rumors about the negotiations between Brown and Cona and his eventual employment as group supervisor at Pizitz, she confronted Cona with respect to her future status with S & L. Cona explained that she was not being fired from S & L, but told her of the two options available to her: she could transfer to Atlanta as an assistant group supervisor with the Rich's group of stores without a reduction in benefits or salary or she could remain in Birmingham with Pizitz as a salon manager with one of its stores. Unfortunately, there were no salon manager positions open with Pizitz at that time.
 
 
 7
 Faced with this choice, Wilson decided to go to Atlanta. She was assured by Cona that if for any reason the Atlanta move did not work out, the company would pay her expenses to move back to Birmingham. In Atlanta her duties remained essentially the same. Soon after Wilson's transfer to Atlanta, Carol Cona was moved to another area of responsibility within the company and was replaced by Chris Webster as the southeastern regional vice president. On April 15, 1986, Webster asked Wilson if she would consider transferring to the Neiman Marcus store in Atlanta as a salon manager. Neiman Marcus was a "national account" and, as a consequence, was separate from the southeastern region which included the Rich's and Pizitz groups. She replied she would accept the Neiman Marcus job as long as her benefits remained the same. The next day, Webster fired Wilson without explanation.
 
 
 8
 In spite of the fact that she had been discharged from the Rich's group on April 16, 1986, she was hired a month later at the Neiman Marcus store as the salon manager, but at the reduced salary of $18,000.00 per year. She continued as manager until she resigned on July 7, 1986, because it had become apparent to her that her fortunes at S & L were on the decline. She came to this conclusion after receiving information from others, primarily John Brown, that her age was a motivating factor for the treatment she received while employed with S & L. In her resignation letter, she promised to work until August 14, 1986, to enable the company to find a replacement. She was fired on July 30, 1986, by the vice president of the Neiman Marcus account. After returning to Birmingham, she commenced this action.
 
 II.
 
 9
 Wilson filed suit against her former employer alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Secs. 621-634[3] and the Equal Pay Act (EPA), 29 U.S.C. Sec. 206(d)(1)[4]. She also charged S & L with sex discrimination pursuant to the provisions of Title VII.[5] Wilson later filed a second complaint for common law fraud under Georgia law against S & L claiming that the company fraudulently induced her to stay in Atlanta at a lower pay scale and then failed to honor the promise to pay for her moving expenses back to Alabama in the event she could not continue her employment in Georgia. Jurisdiction for the fraud cause of action was predicated on diversity of citizenship. S & L's answer to the complaint for fraud included a counterclaim seeking damages for the filing of a frivolous suit. On the motion of the defendant, the district court consolidated both actions for trial.
 
 
 10
 After an eight-day trial, the jury found in favor of Wilson on the age discrimination and fraud actions and in favor of S & L on the equal pay suit. The jury awarded $100.00 as compensatory damages and $112,500.00 in punitive damages on the fraud case and a total of $49,312.00 for the age discrimination claim representing back pay, lost benefits and liquidated damages. Liquidated damages may be awarded upon a finding by the court that the defendant willfully discriminated against the plaintiff. See 29 U.S.C. Sec. 626(b). Damages under the ADEA are both legal and equitable. 29 U.S.C. Sec. 626(b) provides the relief for violation of the act. The section also refers to 29 U.S.C. Sec. 216(b) which contains virtually the same language.
 
 
 11
 Amounts owing to a person as a result of a violation of this chapter [shall be wages as provided for in sections 216 and 217] of this title: Provided, That liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed [as damages].
 
 
 12
 29 U.S.C. Sec. 626(b) (emphasis in original).
 
 
 13
 In a separate order and opinion, the district court found in favor of the defendant on the Title VII claim for sex discrimination.
 
 
 14
 After judgment was entered by the court, both parties filed post-trial motions. S & L moved for judgment notwithstanding the verdict, or in the alternative, a new trial or remittitur in both the fraud and ADEA cases. Wilson moved for reinstatement or prospective relief (front pay).[6] She also filed motions for prejudgment interest and attorneys' fees.
 
 
 15
 On June 16, 1989, the district court heard arguments on all the motions except the motion for attorneys' fees. The hearing was not transcribed. To cure this defect, the parties filed a motion to supplement the record on appeal containing a joint stipulation of the district court's oral rulings made at this hearing.[7]
 
 
 16
 After oral argument, the district court stated from the bench that it was "inclined to hold"[8] that the jury award of $112,500.00 in punitive damages and $100.00 in compensatory damages on the fraud case should be remitted to a total of $50,000.00 damages. If the plaintiff failed to accept the remittitur to $50,000.00, then the district court would order a new trial. The district court also said that it was inclined to hold the jury erred in finding that Wilson was constructively discharged when she resigned in July, 1986. This statement, taken alone, implies that the court was granting S & L's motion for judgment notwithstanding the verdict. However, the court went on to hold that Wilson was wrongfully discharged on April 16, 1986, the date she was abruptly fired as assistant supervisor with the Rich's group by Webster, the regional vice president. The court did not articulate its reason for finding that the discrimination had come to a head in April, or that Wilson was even aware of the discrimination at that point. The only direct evidence of discrimination comes from the testimony of Brown but he did not even tell her about it until July 6, 1986, the day before she was discharged from the Neiman Marcus group. The court stated that Wilson was entitled to an award of front pay in the amount of $7,000.00 per year to represent the difference between the salary following her termination and "the salary she held as an assistant supervisor."[9] R1-2 Supp.Rec. Using $7,000.00 as the measure of damages, the court ordered that she should be paid that amount as prospective damages per year until her sixty-fifth birthday.[10] Wilson was sixty-two[11] at the time of the trial. Depending on whether the court counted age sixty-two as the first year for computing future damages, the total amount of prospective damages for four years (ages sixty-two, sixty-three, sixty-four, sixty-five) could have come to at least $28,000.00. As for her back pay claim, the court indicated that Wilson was entitled $7,000.00 per year from the date of her termination on April 16, 1986, until the date of the trial in April, 1989.[12] In addition to the $21,000.00 awarded as back pay for three years, she was granted another $21,000.00 based on the finding by the jury that S & L acted intentionally.[13] Thus, the total amount for back pay damages came to $42,000.00.
 
 
 17
 Wilson testified that when she was terminated in April, 1986, she lost all of her corporate benefits, including health insurance. R4-130, 132, 142-43. There was also deposition testimony from S & L's personnel manager, James Reik, which the jury could have treated as a corroboration of Wilson's assertion that her benefits were terminated. He stated that he could not think of any reason why Wilson would have been carried on the payroll or considered a "transfer" when she was hired by the Neiman Marcus group in May, 1986. R5-272. The record is not clear whether the benefits were reinstated when she was rehired a month later. However, the court ruled that unless S & L could produce evidence to the contrary before it published its final order, the court would uphold the jury verdict for lost benefits. R1-2 Supp.Rec. The jury awarded an amount of $5,089.00 for lost benefits.[14]
 
 
 18
 To summarize, the district court indicated that it would award a total of $50,000.00 for the fraud claim provided that Wilson accepted the remittitur, up to $75,089.00 in damages on the age claim, representing up to $28,000.00 in prospective damages, $42,000.00 in back pay and liquidated damages, and $5,089.00 in lost benefits. The jury returned a verdict of $100.00 as compensatory damages and $112,500.00 as punitive damages in the fraud action, $19,567.00 for back pay and $5,089.00 for lost benefits on the age claim. To that amount $24,656.00 was added as liquidated damages.
 
 
 19
 Following those statements, on June 16, 1989, the plaintiff's attorney, on July 7, 1989, received a letter from the law clerk to the district court requesting the plaintiff to inform the court whether she would accept the remittitur. The letter was followed up by a phone call from the law clerk on July 14, 1989. On July 17, 1989, the plaintiff's attorney, relying on the court's statements at the motion hearing,[15] responded by letter stating that plaintiff would accept the remittitur of the punitive damages on the fraud claim to $50,000.00. From the language of the letter, it is apparent that counsel for the plaintiff assumed the court would confirm the other rulings made from the bench concerning back pay, prospective damages and lost benefits. This is evident by the statement of counsel that he understood the court would "memorialize" the other oral rulings.[16]
 
 
 20
 On September 13, 1989, the district court issued its written order. The court stated that "[t]his opinion memorializes the terms of the court's ruling of June 16, 1989, and disposes of two other motions still pending before it in this case." R2, Tab 97, p. 2. The written order and opinion differed substantially from the statements made from the bench on June 16, 1989. In the order, the court denied Wilson's request for prejudgment interest and the motion for prospective damages or reinstatement.
 
 
 21
 In its written order, the court found as a matter of law that Wilson was not constructively discharged when she resigned in July, 1986. Instead, the court found that her position was eliminated on April 16, 1986. It found she was rehired in May, 1986, as the salon manager at Neiman Marcus, without any loss of pay or benefits. Id. at 3. It is undisputed that instead of a severance check she continued to receive a check on the dates that coincided with her normal pay period after she was fired in April as the assistant group supervisor for the Rich's group. R4-127-28. The record indicates she was receiving an amount equal to her regular pay. Id. However, the court found that her firing and subsequent rehire represented a willful "demotion, not a discharge." R2, Tab 97 at 3. Thus, when she resigned July 7, 1986, and ultimately left the company on July 30, 1986, because of her perceived belief that she was the victim of age discrimination, the court stated that she failed to prove that " 'working conditions [were] so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign' " (quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir.1987) (emphasis and additions in original). Id.
 
 
 22
 Because the court held that the jury erroneously found that she was constructively discharged in July, 1986, it disallowed the damages of $19,567.00 and $5,089.00 representing back pay and lost benefits respectively. The $24,656.00 which the court awarded after the trial as liquidated damages for back pay and lost benefits was also disallowed. Id., see 29 U.S.C. Sec. 626(b). Except for the remittitur, the court completely ignored the statements made at the June 16, 1989, hearing.
 
 
 23
 The written order also denied plaintiff's motion for reinstatement or front pay because the court found that Wilson voluntarily resigned on July 7, 1986. R2, Tab 97 at 3-4. As for back pay the court found that Wilson was entitled to the difference between the salary she was earning when she was "demoted" in April and her salary when she resigned on August, 14, 1986.[17] The difference in the yearly salary was $7,000.00. By prorating her salary for four months, the court awarded damages for back pay in the amount of $2,333.33 and $2,333.33 as liquidated damages because of the intentional nature of the demotion. Id.
 
 
 24
 The court also denied Wilson's motion for prejudgment interest. Id. The court correctly pointed out that an award of prejudgment interest is discretionary in ADEA cases. See Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1563 (11th Cir.1988). However, one of the factors to be considered by the court is the mitigation of damages. The court stated that there was no evidence that Wilson mitigated her damages after she was no longer in the employ of S & L. The court also denied the recovery for lost benefits because "the record is devoid of any evidence that her insurance coverage was cancelled" before she permanently left the company. R2, Tab 96 at 4.
 
 
 25
 On June 28, 1989, the parties briefed and argued the motion for attorneys' fees. In an order issued on July 7, 1989, the court awarded plaintiff the sum of $52,777.00 in attorneys' fees, and expenses of $2,195.74.
 
 III.
 
 26
 The parties raise the following grounds of error on appeal.[18] Wilson urges that (1) the district court erred in finding that she voluntarily resigned and thus, was not constructively discharged on July 7, 1986; (2) the court erred in denying her request for front pay or reinstatement; (3) the court erred in failing to charge the jury on reinstatement or front pay; (4) the district court refused to award prejudgment interest; and (5) the district court abused its discretion by granting remittitur in the fraud case while at the same time changing the oral rulings made at the June 16, 1989, hearing. S & L complains (1) that the district court erred in denying its motion for judgment notwithstanding the verdict in the fraud suit, or in the alternative, for failing to further remit the fraud damages; (2) that the district court abused its discretion in failing to reduce the award of attorneys' fees to an amount commensurate with Wilson's limited success on her claims; and (3) that Wilson is barred from challenging her acceptance of the remittitur on appeal.[19]
 
 IV.
 
 27
 Wilson does not challenge the acceptance of remittitur of the fraud claim to $50,000.00. She does attack the court's September 13, 1989, written order which, for all intents and purposes, ignored the jury verdict and the equitable relief the court indicated that it would grant on the age discrimination claim at the June 16, 1989, motion hearing. We have no doubt that her acceptance of the remittitur was based on the court's rulings at the motion hearing. We reach this conclusion by noting that the court was inclined to award greater damages than those returned by the jury and from the statements of her attorney contained in his letter to the court.
 
 
 28
 The majority of Wilson's assignments of error find their root in the district court's disposition to substitute its own judgment for that of the jury. Because of the inconsistency between statements made by the district court following the June 16, 1989, hearing, as reflected by the joint stipulation, and the court's memorandum opinion of September 13, 1989, it is impossible to divine the court's basis for its eventual judgment. Did it grant a judgment notwithstanding the verdict on the ADEA claim? Or did the court, without any legal justification, decide to substitute its opinion for that of the jury? The only thing we can be sure of, is that the district court made findings markedly different from those of the jury. As the result of the written order, we have no choice but to treat the district court's ADEA "findings" as a judgment notwithstanding the verdict.
 
 
 29
 The standard of review of an order granting a motion for judgment notwithstanding the verdict is the same as that of the district court. The court must view the evidence,
 
 
 30
 [I]n the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion[ ] is proper. On the other hand, if there is substantial evidence opposed to the motion[ ], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion[ ] should be denied.
 
 
 31
 Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969).
 
 
 32
 Contrary to the jury's findings, the district court, in both its rulings from the bench on June 16, 1989, and the memorandum opinion issued on September 13, 1989, found that Wilson was not constructively discharged on July 7, 1986. This ruling is erroneous for a number of reasons. First of all, the district court properly charged the jury on the issue of constructive discharge. R8-894-95. The court did not instruct the jury with respect to actual discharge or willful demotion on April 16, 1986. The court submitted six interrogatories with the verdict form in connection with the ADEA case. Question one, which the jury answered in the affirmative, asked, "Did plaintiff prove by a preponderance of the evidence that her working conditions were so unpleasant that a reasonable person in her place would have felt compelled to resign?" R2, Tab 83, p. 1. This question conformed with the law of this circuit for determining whether an employee alleging discrimination was constructively discharged. See Garner v. Wal-Mart Stores, 807 F.2d 1536, 1539 (11th Cir.1987).
 
 
 33
 Our independent review of the record reveals that there existed substantial evidence over which reasonable persons could differ as to whether Wilson suffered discrimination because of her age. Boeing, 411 F.2d at 374. The evidence is uncontested that she was terminated on April 16, 1986. S & L claimed she was dismissed because it was abolishing the position of assistant group supervisor in the beauty division. R4-68-69, 72-73; R5-273-75. However, the circumstantial evidence presented to the jury was such that a reasonable person could conclude that her discharge in April, 1986, from the Rich's group was pretextual. Reik, the personnel manager all but admitted that Wilson was the only assistant group supervisor eliminated. R5-274-75. He stated, "I don't know if there were any others," when asked if Wilson was the only assistant supervisor eliminated throughout the country. Id. at 276. He did testify that approximately seventeen of the supervisory force were released during the cutback in 1986. Id. at 282.
 
 
 34
 The day before she was dismissed in April, she was asked by Chris Webster, the southeastern vice president, if she would object to transferring to the Neiman Marcus group as a salon manager. R4-63. A salon manager was a position below that of assistant group supervisor. She replied that she would move anywhere for the company as long as her corporate benefits were not reduced. Id. The next day she was fired without explanation. Id. at 65. As she was gathering her belongings before leaving the Rich's salon, she heard the group supervisor, Thom Slack, tell the stylists that she was not leaving the company, just that particular salon. Id. at 65-66. When she returned the next day to finish some paperwork for Slack, he advised her to call Reik, the personnel manager. He also told her not to worry because a position was available in the Neiman Marcus group. When she talked to Reik, he told her that she had been terminated because the position was being eliminated throughout the division. Id. at 66-69. John Brown, her successor as group supervisor in Alabama, testified that on numerous occasions before Wilson was fired, Chris Webster had told him that he wanted no one working in his salons over the age of forty. Id. at 168.
 
 
 35
 Wilson was hired by Debi Stoup, the Neiman Marcus account vice president, on May 13, 1986, to manage the salon in the Atlanta store. Id. at 77. Her base salary was $18,000.00 per year, $7,000.00 less than what she was earning as an assistant group supervisor at Rich's. Not long after she was hired by S & L to work in the Neiman Marcus store in Atlanta, Brown told her that Barbara Irmeger, the new southeastern vice president, had refused to consider her for the group supervisor's position in Ivey's department stores in North Carolina because Wilson was too old and not "trendy" enough. Id. at 83, 170-172. Brown also testified that he told Wilson that there was no future for her with the company. Id. at 83. The next day, July 7, 1986, Wilson confronted Irmeger and Slack with these alleged statements. On that day she tendered her resignation and promised to stay at the salon until August 14, 1986. Before she could complete her notice period, she was fired on July 30, 1986, by Stoup. Id. at 83-86.
 
 
 36
 Though some of the testimony was conflicting, particularly that of Irmeger, it was the jury's function to weigh the evidence and make credibility determinations, not the duty of the district court. Boeing, 411 F.2d at 375. Webster's purported statements were only disputed during the cross-examination of Brown. R4-188-89. In spite of all this admissible evidence the district court found as a matter of law that Wilson was not constructively discharged. "[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." Boeing, 411 F.2d at 375. Consequently, the district court's order granting judgment notwithstanding the verdict was clearly erroneous. As a result of this error, the court's award of damages reflecting the difference in salary from April through August 14, 1986, of $2,333.33 in back pay and the same amount for liquidated damages must be reversed.
 
 
 37
 Wilson also complains that the district court abused its discretion in failing to instruct the jury on reinstatement or prospective damages[20] or erred in denying the motion for this relief in the September, 1986, written order. 29 U.S.C. Sec. 626 and 29 U.S.C. Sec. 216(b) provide for equitable remedies at the discretion of the district court.[21] The district court did not err in refusing to instruct the jury that Wilson could be reinstated to the same position or a comparable job, or in lieu of reinstatement, that she could receive prospective damages representing the difference in pay in her present employment and the salary she received from S & L. Ironically, after the trial, at the June 16, 1989, motion hearing, the court stated that it was inclined to grant up to $28,000.00 in prospective damages. In the final order, however, this item of damages was excluded.
 
 
 38
 "The purpose of the ADEA, insofar as the individual plaintiff is concerned, is to make the plaintiff 'whole,' to restore the plaintiff to the economic position the plaintiff would have occupied but for the illegal discrimination of the employer." Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1561 (11th Cir.1988). The preferred equitable remedy to achieve this purpose is "reinstatement instead of front pay." Hansard v. Pepsi-Cola Metro. Bottling Co., 865 F.2d 1461, 1469 (5th Cir.1989), cert. denied --- U.S. ----, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989). The general rule is that prospective damages are awarded in lieu of reinstatement when it is not feasible to reinstate the employee. Hansard, 865 F.2d at 1469. This circuit first recognized future pay as an alternative remedy in ADEA cases in O'Donnell v. Georgia Osteopathic Hosp., Inc., 748 F.2d 1543, 1551 (11th Cir.1984). Though the district court has broad discretion to grant equitable relief, such as reinstatement or prospective damages, if it refuses to grant equitable relief "it must carefully articulate its rationale." Castle, 837 F.2d at 1563. Failure to follow this mandate is an abuse of discretion. Id. The district court here abused its discretion in failing to order reinstatement or prospective damages because it found that Wilson was not constructively discharged. We have already declared that the court erred in its conclusion that she was constructively demoted, instead of constructively discharged.
 
 
 39
 The problem with reinstatement in this case is that S & L sold the beauty division (Essanelle) on September 1, 1988. Theoretically, Wilson could have been rehired by Essanelle, but since S & L was found to be ultimately liable for the discrimination, the best solution would be to award front pay as the proper remedy. The court, on June 16, 1989, favored this type of equitable relief, but changed its mind in the September order. Therefore, we hold that because the court did not make clear its reason for failing to grant reinstatement or prospective damages, in light of the jury's finding that she was constructively discharged in July, 1986, it abused its discretion.
 
 
 40
 In faulting the court for failure to grant reinstatement or prospective relief, Wilson also contends that the district court erred in denying the jury's award for the loss of benefits which were terminated after she was fired on April 16, 1986. The jury verdict of $5,089.00 was predicated on a payment of $156.00 per month for approximately thirty-two months of coverage. The district court disallowed the award, first, because the policy purchased by Wilson was not introduced into evidence and second, because of its finding that she was not constructively discharged. As noted above, there was uncontroverted evidence that Wilson bought insurance after she was fired in April, 1986. Moreover, at the June 16, 1989, hearing, the district court stated the award for lost benefits would stand unless S & L could produce evidence that she was covered by the company's insurance plan after she was terminated on April 16, 1986. There is nothing in the record to show that S & L produced any such evidence. Therefore, the jury's findings in this regard should be reinstated.
 
 
 41
 Next, Wilson asserts that the district court abused its discretion by not awarding prejudgment interest on the back pay damages. As pointed out earlier, an award of prejudgment interest is discretionary with the court. Castle, 837 F.2d at 1563. Prejudgment interest is also an equitable remedy, subject to the same abuse of discretion standard for failure to order reinstatement or award prospective damages. Id. As its reason for refusing to allow prejudgment interest, the court stated such an award was not warranted because Wilson failed to mitigate her damages. There is uncontroverted evidence that Wilson returned to Birmingham after leaving the company in July, 1986 and went to work in a beauty salon as a hair stylist and that the next year she obtained a real estate license. Later, she took a job in North Carolina as a motel manager, where she was working at the time of the trial. The record reflects her income from 1986 through the date of trial. R4-134-35. Her average annual income for the period was approximately $16,000.00. Id. From this evidence we conclude that she properly mitigated her damages. As stated before, the district court's failure to articulate a proper reason for denial of equitable relief constitutes an abuse of discretion. Castle, 837 F.2d at 1563. Since the district court's factual finding that Wilson did not take measures to mitigate her damages was clearly erroneous, it abused its discretion in failing to award prejudgment interest.
 
 
 42
 In its cross-appeal, S & L first assigns error on the district court's failure to grant its motion for judgment notwithstanding the verdict on Wilson's cause of action for fraud. Wilson's fraud allegation can best be analyzed by breaking it down into two separate instances. First, she contends that when she was fired as assistant group supervisor with the Rich's group, on April 16, 1986, S & L misrepresented to her that the position of assistant group supervisor was being eliminated throughout the division. Second, she maintains that S & L had no intention of honoring Cona's promise made to Wilson when she agreed to transfer to Atlanta in the spring of 1985 that if things did not work out in Georgia, the company would move her back to Birmingham. We will address these two occurrences of alleged misrepresentation in reverse order.
 
 
 43
 Under Georgia law failure to fulfill a promise to undertake some future event ordinarily will not give rise to an action for fraud. McCravy v. McCravy, 244 Ga. 336, 260 S.E.2d 52 (1979). However, under an exception to this general rule a promise may be considered fraudulent if, at the time it was made, the promisor had no intention of following through with the promise. McCravy, 244 Ga. at 337-39, 260 S.E.2d at 54; Hines v. Good Housekeeping Shop, 161 Ga.App. 318, 318-19, 291 S.E.2d 238, 240 (1982). A plaintiff must establish that a promise or misrepresentation was made, that the plaintiff reasonably relied on the misrepresentation and that the misrepresentation caused the plaintiff harm. Hines, 161 Ga.App. at 318-19, 291 S.E.2d at 240. Another element, and the hardest to prove, is a showing that, at the time the promise was made, there was no intention to honor it. Id., 291 S.E.2d at 240.
 
 
 44
 It is undisputed that Carol Cona, the southeastern regional vice president at the time, promised Wilson that if things did not work out in Atlanta, the company would pay for her to move back to Birmingham. R6-409 (direct testimony of Cona). It is also undisputed, by Cona's own testimony, that after Wilson was fired in April, 1986, the company was not going to keep the promise. R6-469-73. Wilson wrote numerous letters, after she was fired in April and constructively discharged in July, seeking Cona's help in moving her back to Alabama. R6-416, 420 (direct testimony of Cona). Cona never responded to the letters but consulted with Reik, the personnel manager, on how she should handle the matter. Even before Wilson interviewed with the Neiman Marcus group, the personnel manager told Cona that there was no need to respond to the letters because Wilson had already accepted a job as salon manager with the group. Id. at 416-21, 469-71. When Cona received one of the letters from Wilson she sent a memo to the personnel manager and the in-house counsel stating that the agreement was null and void because, first, the statute of limitations had expired and, second, the promise only remained in effect as long as Wilson worked in the southeast region. The Neiman Marcus account was on the same footing as a regional operation. R6-469-73, R5-296-98.
 
 
 45
 Cona's testimony alone discloses that the promise was made and that Wilson's reliance thereon was reasonable. Also, the evidence was sufficient to show that S & L's failure to honor the promise caused Wilson to take a job making less money and to incur increased living expenses. Thus, the ultimate question is whether the evidence supported a finding by the jury that when Cona made the agreement with Wilson to move her back to Birmingham, she did not intend to keep it.
 
 
 46
 Because fraud in itself is by nature subtle and often difficult to prove, the Georgia courts have held that "slight circumstances may be sufficient" to prove its existence. Ringer v. Lockhart, 240 Ga. 82, 83-85, 239 S.E.2d 349, 351 (1977). In cases similar to the one here, usually the only way to prove the intent of the person making the promise at the time the promise was made is through inferences rather than direct evidence. Hayes v. Hallmark Apartments, Inc., 232 Ga. 307, 308-10, 207 S.E.2d 197, 199 (1974). The jury can examine all " '[t]he circumstances, the time, the secrecy, all the transactions before, at the time and afterwards....' " Hines, 161 Ga.App. at 319, 291 S.E.2d at 240 (quoting Birdsong v. State, 120 Ga. 850, 853, 48 S.E. 329 (1902) (emphasis in original).
 
 
 47
 The jury could infer Cona's intent, acting as agent of the company, at the time she made the promise from her acts and statements made later. There was enough evidence to support the jury's finding that she never intended to honor her promise. Cona abruptly transferred Wilson to Atlanta, she refused to answer Wilson's letters, she wrote to the in-house counsel and to Reik stating that the promise was null and void, and she even testified that her ability to actually fulfill the promise would depend on a decision of upper management.
 
 
 48
 Essentially the same analysis can be employed in determining whether the evidence supported a finding that Wilson was fraudulently[22] induced to remain in Atlanta in 1986 and work for less money. This alternative charge of misrepresentation was predicated on the fact that everyone in the company with whom Wilson spoke after she was fired in April, 1986, told her that the termination was the result of an economic decision to abolish the position of assistant group supervisor throughout the division. As the district court correctly instructed the jury, "[m]isrepresentation of a material fact, made willfully to deceive or recklessly without knowledge and acted on by the opposite party or made innocently and mistakenly and acted on by the opposite party, constitutes legal fraud." R8-882; see Mercer v. Woodard, 166 Ga.App. 119, 123-24, 303 S.E.2d 475, 482 (1983).
 
 
 49
 Taking into account all " '[t]he circumstances ... at the time and afterwards,' " Hines, 161 Ga.App. at 319, 291 S.E.2d at 240 (emphasis in original), the jury could infer that a conscious effort was made to utilize Wilson in a lower position and at a lower salary after she was fired in April 16, 1986. Circumstantial evidence supports this finding. On April 15, 1986, Webster asked her if she would be willing to transfer to the Neiman Marcus salon as manager and she agreed only if her salary and benefits were not adversely affected. The next day, Webster fired her. Slack then told her that he was sure that there was an opening in the Neiman Marcus salon. Reik convinced her that she was dismissed from the Rich's group due to the elimination of her job classification as assistant supervisor even though she was the only assistant supervisor discharged in the entire division. Cona received Wilson's letters and was told by Reik, over a week before Wilson even interviewed for the job, that she had already taken a job with the Neiman Marcus group. Within an hour of her interview with Stoup, Wilson was hired as the Neiman Marcus salon manager at a substantially lower salary. The jury had the opportunity to observe the demeanor of the witnesses and make credibility choices. These events and other factors could lead a reasonable jury to conclude that the company fraudulently induced her to remain in Atlanta at a much lower salary.
 
 
 50
 With all these facts in mind, we find that there was sufficient evidence to support a jury verdict on the fraud and misrepresentation action. Consequently, we find that the district court did not err in denying defendant's motion for judgment notwithstanding the verdict on the fraud claim or, in the alternative, remitting the damages further.
 
 
 51
 S & L next claims the district court abused its discretion in not reducing the award of attorneys' fees by disallowing hours spent on plaintiff's unsuccessful counts. The plaintiff is only required to provide enough competent information to enable the court to accurately apportion legal fees and costs. Perkins v. Mobile Housing Board, 847 F.2d 735 (11th Cir.1988). The district court was faithful to that task. The record is sufficiently developed to reflect that the district court allowed reasonable fees and costs only for the time spent on the successful claims. There was no error in the computation of attorneys' fees.
 
 
 52
 Accordingly, the order granting S & L's motion for judgment notwithstanding the verdict on the ADEA claim is REVERSED, the orders denying front pay, prejudgment interest and lost benefits are REVERSED, the order of remittitur or a grant of a new trial on the fraud claim and the order awarding attorneys' fees are AFFIRMED, and the case is REMANDED for reinstatement of the jury verdict on the ADEA claim and for consideration of the proper award of equitable relief.
 
 
 
 [1]
 Pursuant to Fed.R.App.P. 28(h) in cases in which cross-appeals are filed, the plaintiff in the trial court is deemed the appellant and the defendant the appellee
 
 
 [2]
 The appellee's trade name is S & L Acquisition Company, L.P. (hereinafter S & L)
 
 
 [3]
 29 U.S.C. Sec. 623 states in pertinent part:
 It shall be unlawful for an employer--
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.
 29 U.S.C. Sec. 623(a)(1).
 
 
 [4]
 29 U.S.C. Sec. 206(d)(1) provides in part:
 No employer having employees subject to any provisions of this section shall discriminate, ..., between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work.
 Id.
 
 
 [5]
 42 U.S.C. Sec. 2000e-2 makes it unlawful for an employer to discriminate on the basis of race, color, religion, sex or national origin
 
 
 [6]
 Prospective damages may be recovered when it is not feasible to reinstate the dismissed employee. The amount of prospective damages is the difference between what the employee was earning at the time the cause of action arose and the earnings at the time of trial. Prospective damages are sometimes referred to as "front pay." See generally, Annotation, Award of "Front Pay" Under Sec. 7 of Age Discrimination in Employment Act of 1967 (29 USCS Sec. 626), 74 ALR Fed. 745 (1985)
 
 
 [7]
 Most of the events in issue occurred in 1986. However, both the appellant and the appellee in their joint stipulation refer to 1987. The same is also true with the briefs filed with this court. The parties transmitted to the court their verbal agreement that a typographical error was made in the preparation of the joint stipulation and the dates should reflect the year 1986 instead of 1987
 
 
 [8]
 Joint Stipulation of the Parties, R1-1 Supp. Rec
 
 
 [9]
 The court apparently meant that the measure of damages for prospective relief was the difference between her salary as an assistant supervisor and her pay as a salon manager at Neiman Marcus. Her salary as an assistant supervisor was $25,000.00 per year. Her annual income as a salon manager was $18,000.00, hence the figure of $7,000.00. The court failed to take into consideration the stability of her salary if she had stayed with S & L until her retirement. Neither did the court take into consideration her average annual pay after she left S & L. Since 1986, her income has averaged around $16,000.00 a year. R4-134-35
 
 
 [10]
 Again, no consideration is given to her past and present salary. See note 9, supra
 
 
 [11]
 The court, in its memorandum opinion denying relief on the Title VII sex discrimination charge, stated that Wilson was fifty-nine years old at the time of the trial. There is nothing in the record to support this statement
 
 
 [12]
 The stipulation stated that she should receive back pay through the date of the trial in May, 1989. The trial was held in April, 1989
 
 
 [13]
 This "doubling" represents liquidated damages which, according to 29 U.S.C. Sec. 216(b), constitutes an amount "equal" to the back pay damages awarded due to the intentional discrimination. Id
 
 
 [14]
 Loss of fringe benefits is considered a legal remedy and thus, a jury question. Kelly v. Matlack, Inc., 903 F.2d 978, 984-85 (3d Cir.1990)
 
 
 [15]
 Plaintiff's letter to the court stated:
 [W]e were informed orally that the Court intended to remit the fraud verdict from the $112,500.00 figure to a $50,000.00 figure. Of course, any order would be a conditional grant of a new trial unless the remittitur was accepted.
 Please be advised on behalf of the plaintiff we accept the remittitur to the amount of $50,000.00 based on the Court's ruling. I understand, that even though no written order has been issued on this matter to date, one will be forthcoming memorializing these rulings.
 
 
 [16]
 See note 15, supra
 
 
 [17]
 She resigned on July 7, 1986, but stated that it would not become effective until August 14, 1986. On July 30, 1986, she was fired by the vice president of the Neiman Marcus group
 
 
 [18]
 There is no appeal by the plaintiff of the jury verdict on the EPA claim or the district court's findings in the Title VII cause of action
 
 
 [19]
 We do not address S & L's third assignment of error that Wilson may not now challenge her acceptance of remittitur. Wilson is not appealing the remission of the punitive damages returned in her pendant state action for fraud. The fraud cause of action is an entirely separate suit. It is a pendant state claim consolidated for trial with the federal discrimination charge. Wilson is appealing only the rulings of the district court made in connection with her charge of age discrimination. S & L simply misses the point of the focus of Wilson's appeal. She has no argument with the court's remission of the punitive damages in the fraud case
 
 
 [20]
 Since reinstatement and prospective damages are equitable in nature, the court had no obligation to instruct the jury on these remedies. However, a few courts have submitted the question to the jury for advisory purposes. See Dickerson v. Deluxe Check Printers, Inc., 703 F.2d 276 (8th Cir.1983)
 
 
 [21]
 29 U.S.C. Sec. 626(b), besides referring to 29 U.S.C. Sec. 216(b), states that "the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion." Id. 29 U.S.C. Sec. 216(b) is almost a verbatim quote of Sec. 626(b) as it pertains to legal and equitable relief
 
 
 [22]
 Wilson only alleged one count of fraud, however, because of the way the claim was presented to the jury, for the sake of analysis, it is simpler to break the claim down into two allegations