Anthony L. SASSER, Plaintiff/Appellee,

v.

**AVERITT EXPRESS, INC.,**
Defendant/Appellant.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

May 8, 1992.

Permission to Appeal Denied by
Supreme Court Sept. 14, 1992.

William J. Harbison, O'Hare, Sherrard & Roe and Robert L. Trentham, Lassiter, Tidwell & Trentham, Nashville, for defendant/appellant.

Jon E. Jones, Moore, Jones, Radar & Clift, Cookeville, for plaintiff/appellee.

## OPINION

KOCH, Judge.

This appeal involves a long-haul truck driver who was discharged within hours after settling a suit for permanent partial disability benefits. The driver sued his former employer in the Circuit Court for Putnam County alleging that he had been discharged in retaliation for pursuing his workers' compensation claim. The employer asserted that its decision was based solely on the driver's physical inability to do the work. A jury found for the driver and awarded him $500,000 in actual and punitive damages. The employer has appealed. While the record contains material evidence to support the jury's conclusion with regard to liability, we find that the instructions concerning the calculation of damages were in error. Accordingly, we vacate the damage award and remand the case for a trial on the issue of damages only.

### I.

Averitt Express, Inc. ("Averitt") is a regulated common carrier operating primarily in the southeastern United States. It employs approximately 2,300 persons at forty locations throughout seven states. In August, 1984, Averitt hired Anthony Sasser to work as a driver at its Cookeville terminal. Mr. Sasser was 41–years–old and had nineteen years of experience as a long-haul truck driver.

Mr. Sasser injured his back in August, 1985 while getting out of the sleeping compartment of his tractor. He continued to work for several days until the pain caused him to consult Dr. Leighton Smith. Dr. Smith eventually referred Mr. Sasser to Dr. Ray W. Hester, a Nashville neurosurgeon, who discovered that Mr. Sasser had a ruptured lumbar disc.

Dr. Hester performed a lumbar laminectomy on Mr. Sasser on August 23, 1985. The operation was successful, and one month later, Dr. Hester permitted Mr. Sasser to return to work with restrictions on his physical activity. These restrictions significantly limited Mr. Sasser's lifting and bending as well as the amount of con-

tinuous driving he could do. Averitt informed Mr. Sasser that it would not permit him to return to work at that time because of the extent of the restrictions imposed by Dr. Hester and because Mr. Sasser was taking a prescribed muscle relaxer that could impair his driving.

Mr. Sasser continued to convalesce at home for the next several months. In December, 1985 Dr. Hester found that Mr. Sasser had reached his maximum medical improvement and gave him a permanent disability rating of 15% to the body as a whole. Mr. Sasser met with Johnny Johnson, his immediate supervisor, who encouraged him to settle his permanent disability claim and to obtain his doctor's release from his work restrictions before returning to work.

In mid-December Mr. Sasser and a representative of Fireman's Fund Insurance Company ("Fireman's Fund"), Averitt's workers' compensation carrier, tentatively agreed to settle his permanent disability claim for approximately $10,000. Mr. Sasser also obtained two letters from Dr. Hester stating that Mr. Sasser could return to work without restrictions. Averitt's own physician also examined Mr. Sasser and cleared him to return to work without restrictions. Accordingly, Mr. Sasser returned to work on January 15, 1986.

Unbeknownst to Averitt, Mr. Sasser had consulted an attorney about the proposed settlement of his permanent disability claim before he returned to work. Mr. Sasser decided not to accept Fireman's Fund's settlement offer after the attorney told him that his disability rating was normally worth "three or four times" more than he had been offered. One week after he returned to work, Mr. Sasser sued Fireman's Fund in the Chancery Court for Putnam County seeking unpaid temporary disability benefits, medical expenses, and a lump-sum permanent disability award.

News of the suit prompted an acrimonious confrontation in February, 1986 between Mr. Sasser and Brad Arnold, Averitt's terminal manager. During the conversation, Mr. Arnold called Mr. Sasser a "two-face[d] liar" and a "back stabber."

He also said that Mr. Sasser "had made a fool out of him" and that he did not "understand why that you would sue Averitt Express after we've been so good to you ..."

Approximately one month later, Mr. Sasser met with Mr. Arnold, Mr. Johnson, Richard Godsey, Averitt's executive vice president of human resources, and Bill Legge, Averitt's insurance agent. Mr. Godsey observed that Mr. Sasser appeared to have an "attitude problem" after Mr. Sasser requested to be paid for the five weeks Averitt had delayed in putting him back to work. Mr. Godsey finally agreed to pay Mr. Sasser for three of the five weeks, and Mr. Sasser assured Mr. Godsey that he had "no problem" with Averitt, Mr. Arnold, or Mr. Godsey.

Mr. Sasser consulted Dr. Hester again in May, 1986 to prepare for the chancery court hearing on his workers' compensation suit. Since Mr. Sasser was complaining of continued pain and other problems, Dr. Hester placed him under the same work restrictions that he had prescribed in September, 1985. Mr. Sasser did not inform Averitt of what Dr. Hester had done, and Averitt did not learn of the restrictions until July, 1986 when it obtained a copy of Dr. Hester's deposition. Notwithstanding the restrictions, the record contains no evidence that Mr. Sasser had not been performing his duties satisfactorily since his return to work.

Mr. Sasser settled his suit against Fireman's Fund for $30,340, based on 45% permanent partial disability to the body as a whole. The chancery court approved the settlement on July 14, 1986. When Mr. Sasser returned to work, Mr. Godsey informed him that Averitt could no longer use him because of his 45% disability rating. He instructed Mr. Sasser to turn in his uniforms and keys and to clear out all his personal belongings. Mr. Godsey also authorized Mr. Johnson to prepare a payroll status record stating that Mr. Sasser had been "terminated due [to] 45% disability which he was granted to the body as a whole—we can't use!"

Dr. Smith examined Mr. Sasser the next day and certified that he met all of the

Department of Transportation's requirements for long-distance truck drivers. When he received Dr. Smith's certificate, Mr. Arnold told Mr. Sasser that Averitt still "couldn't use" him. Several days later, in an effort to forestall a threatened lawsuit, Averitt offered Mr. Sasser a job washing trucks for $14,000 per year. Mr. Sasser turned down the offer since he had been earning $37,200 per year as a driver.

Mr. Sasser filed a retaliatory discharge action against Averitt in August, 1986. He went to work for Roberts Contract Carrier ("Roberts") in October, 1986 as a full time driver. He remained with Roberts until May, 1988 when he went to work as an independent driver for another trucking company. The salaries and benefits for both jobs were less than what he had been earning with Averitt.

As the trial neared, Averitt offered to reinstate Mr. Sasser either to a non-driving position with no health or physical requirements for $25,688 per year or to a driving position for $38,000 per year with minimum physical conditions. When Mr. Sasser declined the offer, Averitt requested a hearing on his claims for reinstatement and for future lost earnings. The trial court entered an order in June, 1990 finding that reinstatement was feasible but that it lacked jurisdiction to order Mr. Sasser to return to work for Averitt.

Following a five-day trial, a jury awarded Mr. Sasser $250,000 in compensatory and $250,000 in punitive damages. The trial court later denied Averitt's post-trial motions but, in response to Mr. Sasser's motion, vacated its earlier finding that Mr. Sasser's reinstatement at Averitt was feasible. Averitt has perfected this appeal.

## II.

We turn first to Averitt's challenge to the evidentiary adequacy of Mr. Sasser's

case. Averitt continues to insist that Mr. Sasser's retaliatory discharge claim should never have gone to the jury because the company proved conclusively that it discharged Mr. Sasser for valid, non-pretextual reasons. We disagree. The proof, when viewed in its entirety, does not support Averitt's theory of the case alone. The record contains sufficient material evidence to support the jury's conclusion that Mr. Sasser's decision to file suit for his permanent partial disability benefits was a substantial motivating factor in Averitt's decision to discharge him.

## A.

■ Employees have the burden of proof in retaliatory discharge cases. To prevail in a case involving a claim for workers' compensation benefits, an employee must prove: (1) that he or she was employed by the defendant, (2) that he or she sought workers' compensation benefits, (3) that the defendant discharged him or her, and (4) that the request for workers' compensation benefits was a substantial motivating factor in the defendant's discharge decision. *Johnson v. Saint Francis Hosp., Inc.*, 759 S.W.2d 925, 928 (Tenn.Ct.App. 1988); *Anderson v. Standard Register Co.*, App. No. 01–A–01–9102–CV–00035, slip op. at 11, 17 T.A.M. 17–5, 1992 WL 63421 (Tenn.Ct.App. Apr. 1, 1992).[1]

■ The burden of going forward with the evidence does not shift to the employer until the employee has made out a prima facie case. Accordingly, an employer need not prove that its reason for discharging the employee was valid and non-pretextual until the employee has established the required link between the discharge and the claim for workers' compensation benefits. *Johnson v. Saint Francis Hosp., Inc.*, 759 S.W.2d at 928; *Sibert v. State*, App. No. 89–176–11, slip op. at 9–10, 14 T.A.M. 48–

---

**1.** The fourth element in the Western Section's formulation of a retaliatory discharge cause of action was "an exclusive causal relationship between plaintiff's actions and defendant's actions." *Johnson v. Saint Francis Hosp., Inc.*, 759 S.W.2d at 928. In light of the Tennessee Supreme Court's decision in *Chism v. Mid–South Milling Co.*, 762 S.W.2d 552, 556 (Tenn.1988),

the Middle Section has replaced the Western Section's "exclusive causal relationship" requirement with the less burdensome "substantial motivating factor" requirement. *Anderson v. Standard Register Co., supra*, slip op. at 11. The trial court's instruction embodied the "substantial motivating factor" standard.

20, 1989 WL 126710 (Tenn.Ct.App. Oct. 25, 1989).[2] An employee may contradict an employer's assertion that the reasons for the discharge were non-pretextual either by persuading the finder of fact that the discharge was substantially motivated by the desire to retaliate or by showing that the employer's proffered explanation is unworthy of credence. *Buckner v. General Motors Corp.*, 760 P.2d 803, 807 (Okla.1988).

### B.

■ Averitt took the position at trial that it discharged Mr. Sasser only because he was physically unable to do his job. Mr. Sasser decided to challenge this assertion by demonstrating that Averitt's proffered explanation was not worthy of credence. He succeeded. The inconsistencies in Averitt's proof were sufficient to permit the jury to conclude that the company's justification for its decision was pretextual.

Mr. Sasser's problems with Averitt began when he decided to file suit for his workers' compensation benefits instead of accepting Fireman's Fund's settlement offer. News of the suit prompted Averitt's terminal manager to call Mr. Sasser a "two-face[d] liar" and a "back stabber" and to tell Mr. Sasser that "[s]uing the insurance company or Averitt Express is just like me suing my wife. I wouldn't expect her to live with me, she'd divorce me." Within hours after Mr. Sasser settled his case for three times more than Fireman's Fund's original offer, the same manager, observing that Mr. Sasser had "got an awful big settlement there," told Mr. Sasser that "I don't believe that Averitt Express can use you any more."

Averitt's witnesses' testimony at trial concerning their reasons for discharging Mr. Sasser differed markedly from their testimony during pretrial discovery. Initially, the management employees explained that the company followed a policy of taking off the road any driver who was awarded any amount of disability to the body as a whole without regard to the driver's ability to work or to meet the

Department of Transportation's physical requirements. They stated that they had discharged Mr. Sasser solely because the chancery court had awarded him workers' compensation benefits based on a 45% permanent partial disability and that Mr. Sasser had had the choice of seeking workers' compensation benefits or keeping his job.

The same employees testified at trial that Mr. Sasser's workers' compensation recovery played no role in their decision and that they had discharged Mr. Sasser solely because he was physically unable to do his job. Disavowing any policy of removing drivers who obtained a workers' compensation judgment based on a permanent partial disability to the body as a whole, these employees insisted that they made their decisions on a case-by-case basis and that their foremost concern was for public safety and the employee's ability to do the job.

Mr. Sasser's counsel exhibited overhead projections at trial juxtaposing the various versions of Averitt's reasons for discharging Mr. Sasser. While management's testimony at trial was certainly more measured and reasonable, it is not necessarily more credible and was certainly not conclusive.

Reconciling apparently conflicting testimony, either between the parties or among the parties' own witnesses, and evaluating the credibility of the witnesses' are, in the first instance, the jury's responsibilities. *Main St. Transfer & Storage Co. v. Smith*, 166 Tenn. 482, 486, 63 S.W.2d 665, 666 (1933); *Kinney v. Yazoo & Mississippi Valley R.R.*, 116 Tenn. 450, 453, 92 S.W. 1116, 1116 (1906); *Clark v. Engelberg*, 58 Tenn.App. 721, 731, 436 S.W.2d 465, 470 (1968). This court does not have the same ability to perform these tasks because we do not have the opportunity to observe the witnesses while they are testifying. *See Cumberland Tel. & Tel. Co. v. Smithwick*, 112 Tenn. 463, 468–69, 79 S.W. 803, 804 (1904); *Tennessee Coal & Railroad Co. v. Roddy*, 85 Tenn. 400, 403, 5 S.W. 286, 288 (1887).

**2.** No Tenn.R.App.P. 11 application was filed in   this case.

Accordingly, this court does not reweigh the evidence and does not reevaluate the witnesses' credibility on appeal from a jury verdict. *Truan v. Smith*, 578 S.W.2d 73, 74 (Tenn.1979). Instead, we accord the jury's verdict great weight, *Karas v. Thorne*, 531 S.W.2d 315, 317 (Tenn.Ct.App. 1975), and will only set aside a verdict when it lacks material evidentiary support. Tenn.R.App.P. 13(d); *Electric Power Bd. v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn.1985); *Cary v. Arrowsmith*, 777 S.W.2d 8, 23 (Tenn.Ct. App.1989).

When we are requested to review the denial of a motion for a directed verdict, we view the evidence in the light most favorable to the motion's opponent and grant the motion only when the evidence can reasonably support but one conclusion. *Goode v. Tamko Asphalt Prods., Inc.*, 783 S.W.2d 184, 187 (Tenn.1989); *Crosslin v. Alsup*, 594 S.W.2d 379, 380 (Tenn.1980); *Maddux v. Cargill, Inc.*, 777 S.W.2d 687, 691 (Tenn. Ct.App.1989). The evidence in this case does not support only Averitt's version of the case. Therefore, the trial court properly denied Averitt's motions for a directed verdict and for a judgment notwithstanding the verdict.

The jury was called upon to decide whether Averitt discharged Mr. Sasser in retaliation for pursuing his workers' compensation claim or whether Averitt discharged Mr. Sasser because he was physically unable to do his job. The jury chose to believe Mr. Sasser and to disbelieve Averitt. In our view, the record contains material evidence upon which the jury could reasonably have reached this conclusion. Accordingly, we find that the jury's conclusion that Averitt discharged Mr. Sasser for pursuing his workers' compensation benefits should be affirmed.

**3.** Mr. Sasser prepared twelve unnumbered special requests, and Averitt prepared eighteen. Neither the requests themselves nor the record indicate when the trial court first received the requests. All the special requests were filed as exhibits on August 3, 1990 after the jury retired to consider its verdict.

### III.

Averitt also takes issue with two portions of the jury instructions. It asserts that one of the challenged instructions "amounted to a directed verdict for the plaintiff" and that the other was a charge with respect to matters of fact in violation of Tenn. Const. art. 6, § 9. We find that the instructions concerning the elements of a retaliatory discharge cause of action and the relationship between actual impairment and a workers' compensation impairment rating were proper.

### A.

The record's account of the preparation of the jury instructions is somewhat murky. Both parties apparently prepared special requests for the trial court's consideration, but the record does not disclose when these requests were submitted to the trial court.[3] The trial court's remarks show that the court considered the special requests in preparing its charge, but the trial court never specifically indicated its action with regard to each requested instruction.[4]

Immediately before charging the jury, the trial court invited both parties to submit "additional special requests." In response to Averitt's counsel's statement that he "would like to be heard on the charge," the trial court stated: "We'll have a charge conference. If I can't resolve it, then you all may put any objection you have to the Court's charge on the record either before or after we argue the case to the jury." The trial court then charged the jury using instructions based, in part, on both parties' special requests. As far as the record shows, no charge conference was ever held, and neither party requested further instructions or objected to the charge.

**4.** Referring to Averitt's special requests, the trial court noted that "the Court of Appeals will be able to determine what portions of it [the special requests] I included and what I didn't." While this observation is certainly true, it is a better practice for the trial court to give its specific decision with regard to each requested instruction.

Averitt's September 12, 1990 motion for a new trial contained only general objections to the instructions, stating that they "far transcended an impartial instruction on the law and in essence became a jury argument highlighting and unduly emphasizing the plaintiff's theory of liability." On September 20, 1990, Averitt supplemented its original motion for a new trial by filing a transcript of the trial court's charge that identified the specific portions of the charge to which it objected.

## B.

■ Averitt takes issue with the portion of the charge in which the trial court explained the elements of a retaliatory discharge cause of action. The instructions are based on the pattern jury instruction,[5] the Tennessee Supreme Court's decision in *Clanton v. Cain–Sloan Co.*, 677 S.W.2d 441 (Tenn.1984), and the parties' special requests.

The portions of the charge relevant to this issue are as follows:

As a general rule in Tennessee, any employee at will, such as the Plaintiff, can be discharged without breach of contract for good cause, bad cause, or no cause at all. [T.P.I.—Civil § 8.70][6]

An exception to this rule, however, exists where the cause of the discharge is the employee's exercise of his rights under the workman's compensation law. [T.P.I.—Civil § 8.70]

Tennessee Workman's Compensation Act is a comprehensive system that reflects a compromise between the interest of the employers and the employees. It provides an expeditious and certain recovery for the employee while limiting the amount of liability to which the employer is exposed. [*Clanton,* 677 S.W.2d at 443]

The Workman's Compensation Act created a duty on the employer to compensate employees for work-related injury. The Act also creates a right of employees to receive such compensation. In order

for the goals of the Workman's Compensation Act to be realized and for the public policy embodied in the Act to be carried out, an employee must be able to exercise his rights under the Workman's Compensation law in an unfettered fashion without being subject to reprisal. [*Clanton,* 677 S.W.2d at 443]

If employers were permitted to penalize employees for filing workman's compensation claims, a most important public policy would be undermined. The fear of being discharged would have a damaging effect upon the exercise of the statutory right. Employees would not file claims for justly deserved compensation deciding instead to continue their employment without incident. [*Clanton,* 677 S.W.2d at 443] The end result is that the employer would be effectively relieved of its obligation under the law and the employee would be deprived of his right under the law. [*Clanton,* 677 S.W.2d at 444]

It is the policy and the law of this State that an employee must be able to exercise his rights under the Workman's Compensation laws without fear of reprisal or penalty from his employer. [T.P.I.—Civil § 8.70].

\*   \*   \*   \*   \*   \*

I further charge you that any practice or policy of an employer which forces an employee to choose between exercising his rights under the Workman's Compensation Act or continued employment is illegal. Any discharge based on such a policy is a retaliatory discharge. [Sasser's request no. 3]

An employer cannot legally discharge an employee because of the amount of disability awarded in a workman's compensation order. [Sasser's request no. 3]

On the other hand, if an employee is discharged because of his inability due to physical restrictions to successfully and safely perform his job and retaliation for the exercise of his right under the Worker's Compensation Law is not a substan-

---

5. *See* 8 *Tennessee Practice,* T.P.I.—Civil § 8.70 (2d ed. 1988).

6. We have added the bracketed references in order to indicate the source of the particular instruction.

tial factor in the decision to terminate, then such a discharge would not be illegal.

In an employment contract, an implied condition absent an agreement otherwise is that both parties must be capable of performing. It is generally held that a contract for personal services is terminated by the sickness or permanent disability of a servant whereby he is rendered unable to perform his job. [Averitt's request no. 13]

■■■ The trial court's instructions must accurately embody the parties' respective theories, *Street v. Calvert*, 541 S.W.2d 576, 584 (Tenn.1976), and must be couched in plain terms that average jurors will understand. *Gross v. Nashville Gas Co.*, 608 S.W.2d 860, 872 (Tenn.Ct.App.1980); *Martin v. Castner–Knott Co.*, 27 Tenn.App. 421, 431, 181 S.W.2d 638, 642 (1944). We will not invalidate instructions as long as they fairly define the legal issues involved in the case and do not mislead the jury. *Smith v. Parker*, 213 Tenn. 147, 156, 373 S.W.2d 205, 209 (1963); *Railroad Co. v. Spence*, 93 Tenn. 173, 187, 23 S.W. 211, 215 (1893).

We find that these instructions fairly and straightforwardly embody the issues in this case. They do not amount to a directed verdict for Mr. Sasser on the issue of liability. Accordingly, they do not provide a basis for setting the verdict aside.

### C.

■■■ Averitt also asserts that the trial court's instructions concerning the relationship between Mr. Sasser's workers' compensation disability rating and his ability to work as a long-haul truck driver violated Tenn. Const. art. 6, § 9. In a charge based on one of Mr. Sasser's special requests, the trial court stated: .

The term "permanent partial disability" as used in the Workman's Compensation Act does not mean the same thing as anatomical disability or medical impairment. [Sasser's request no. 1]

The percentage of disability set forth in a Workman's Compensation Order is determined by a consideration of a number of specialized factors. [Sasser's request no. 1] Among these factors are the injured employee's age, education, training, experience, and work history, the restrictions placed on the employee by his physician, the amount of medical impairment, and the interference these impairments in the employee's being able to get and hold any or all of the jobs which he would otherwise have available to him either now or in the future and in the area of his residence and his ability to earn.

In addition, the Workman's Compensation Act requires that Courts construe the Act liberally in favor of the employee. It is not uncommon, therefore, that a Court will award a high percentage of partial permanent disability in a workman's compensation case to an employee who is fully able to competently and safely perform his regular work. [Sasser's request no. 1]

Moreover, Courts frequently assign a percentage of Workman's Compensation disability which substantially exceeds the percentage of medical impairment assigned by the doctor. The fact that the Plaintiff settled his Workman's Compensation claim for a monetary amount based on a 45–percent disability does not necessarily mean that the Plaintiff's ability to perform his job as a truck driver was diminished by 45 percent or by any material amount. It would be very improper for you to conclude that the Plaintiff's ability to perform his duties as a truck driver was impaired merely because of the terms of the Workman's Compensation order—settlement order. [Sasser's request no. 1]

Tenn. Const. art. 6, § 9 provides that "[t]he judges shall not charge the jury with respect to matters of fact, but may state the testimony and declare the law." Its two-fold purpose is to maintain the trial court's impartiality and to preserve the jury's fact-finding role. *Leighton v. Henderson*, 220 Tenn. 91, 98, 414 S.W.2d 419, 421 (1967); *Renney v. Mayfield*, 5 Tenn. (5 Hayw.) 165, 166–67 (1817). Accordingly, Tenn. Const. art. 6, § 9 has been

construed to prevent trial courts from influencing the jury by "summing up" the evidence in the manner of the English courts, commenting on the weight of the evidence, or giving instructions concerning the factual inferences to be drawn from the proof. *Bolin v. State,* 219 Tenn. 4, 15, 405 S.W.2d 768, 773 (1966); *Tyrus v. Kansas City, Ft. Scott & Memphis R.R.,* 114 Tenn. 579, 584, 86 S.W. 1074, 1075 (1905); *Ivey v. Hodges,* 23 Tenn. (4 Hum.) 154, 155–56 (1843).

We do not view the trial court's instructions as improperly charging the jury with regard to factual matters. The instruction explains accurately and in easily understood terms the relationship between actual disability and a workers' compensation disability rating. Accordingly, we find no error in the instruction.

### IV.

Averitt's final issues concern the awards for compensatory and punitive damages. The company asserts that the proof did not warrant submitting the punitive damage issue to the jury and that the trial court's instructions with regard to front pay were erroneous. While we find that the evidence could support an award for punitive damages, we have concluded that both the substance of the damage instructions and the manner in which the damage issues were submitted to the jury were improper.

### A.

In April 1990 Averitt offered to reinstate Mr. Sasser either to a driving or to a nondriving position. Both jobs were at the top rate of pay for their particular classification.[7] The nondriving job was without conditions, but the driving job had certain medical conditions. Averitt later offered to abandon the medical requirements if the court found them to be unnecessary or unreasonable. It also offered to subject any later decision to discharge Mr. Sasser to immediate judicial review.

After Mr. Sasser declined its offer, Averitt requested a "preliminary evidentiary hearing" to determine whether reinstatement was feasible. During the April 1990 hearing, Averitt's management testified that they bore no animosity toward Mr. Sasser and that, if he accepted the reinstatement offer, he would be placed in the normal rotation used for all Averitt drivers. Mr. Sasser testified that he did not trust Averitt and that he would not feel comfortable working there.

In June 1990, the trial court filed a memorandum opinion finding that "with additional safeguards as might be imposed by the court, under the facts of this case, reinstatement would be feasible." The trial court also found that "there is [an] insufficient showing of animosity to create an impediment to reinstatement." However, the trial court declined to order reinstatement on the grounds that it did not have jurisdiction to do so.

The trial court's jury instructions with regard to damages were drawn largely from the parties' special requests, not from the pattern jury instructions. They did not include the pertinent pattern instructions concerning compensatory or punitive damages in general or the measure of damages in retaliatory discharge cases.[8] Likewise, no mention was made of the effect of Averitt's reinstatement offer or the reasonableness of Mr. Sasser's refusal.

The jury awarded Mr. Sasser $250,000 in compensatory damages and $250,000 in punitive damages. The compensatory damages were in a lump sum, and thus it is impossible to differentiate between the award for back pay and the award for front pay.

Mr. Sasser filed a post-judgment motion in September 1990, requesting the trial court to reconsider the portion of its June 1990 opinion finding that his reemployment at Averitt was feasible. In an order filed two weeks later, the trial court, "[a]fter making another and independent examination of all the evidence presented at trial on

---

7. The annual salary for the nondriving job was $25,668, while the annual salary for the driver position was $38,000.

8. *See* 8 *Tennessee Practice* T.P.I.—Civil §§ 8.70, 14.55.

this issue," concluded that "reinstatement would not have been feasible in this case."

### B.

The Tennessee Supreme Court created the retaliatory discharge cause of action involved in this case in 1984 when it held that employees discharged for seeking workers' compensation benefits could sue their former employer for compensatory and punitive damages. *Clanton v. Cain–Sloan Co.,* 677 S.W.2d 441 (Tenn.1984). The *Clanton* decision, as well as the Supreme Court's later decisions, have left many unanswered questions concerning how this cause of action works. Thus, both the trial and the appellate courts have had little practical guidance concerning such matters as: the availability of reinstatement as a remedy; the propriety of "front pay;" and the respective roles of the trial court and the jury.

This appeal requires us to confront each of these issues because the trial court held (1) that reinstatement was not an available remedy in cases of this type, (2) that Mr. Sasser was entitled to front pay, and (3) that the jury should determine whether front pay should be awarded and the amount. We disagree with each of these conclusions.

### Reinstatement as a Remedy

■ The Supreme Court has left the precise nature and scope of the remedies in *Clanton*-type cases uncertain. Thus, in fashioning the remedies in this case, we must consider the reasons for recognizing the retaliatory discharge cause of action in the first place.

The Supreme Court articulated only one reason for recognizing a cause of action in *Clanton*-type cases. It intended to prevent employers from relieving themselves of their obligations under the workers' compensation laws. *Clanton v. Cain–Sloan Co.,* 677 S.W.2d at 444–45. However, its decision to permit discharged employees to obtain damages indicates that the Supreme Court may have intended to provide a remedy designed to fully compensate discharged employees for their economic injuries or, in other words, to make the employees whole. *Inland Container Corp. v. March,* 529 S.W.2d 43, 44 (Tenn.1975) ("compensatory damages ... are awarded to make the plaintiff whole or to compensate him for the loss he has sustained"). Thus, for the purposes of this opinion, we will assume that the *Clanton* cause of action is intended to serve both purposes.

We think that the Supreme Court would accord the lower courts some latitude in fashioning remedies to carry out *Clanton's* purposes. In other contexts, the courts have recognized that a discharged employee can be made whole through an award of back pay and either reinstatement or, in certain circumstances, front pay. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 416–22, 95 S.Ct. 2362, 2370–74, 45 L.Ed.2d 280 (1982); *Krause v. R.R. Donnelley & Sons Co.,* App. No. 89–296–11, slip op. at 12–13, 15 TAM 14–8, 1990 WL 18186 (Tenn. Ct.App. Mar. 2, 1990) (no Tenn.R.App.P. 11 application filed).

Reinstatement coupled with back pay involves the least amount of uncertainty. *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2d Cir.1984). Because of the inherently speculative nature of front pay awards, most courts now recognize reinstatement as the preferred remedy in cases involving discharged employees. *Wilson v. S & L Acquisition Co., L.P.,* 940 F.2d 1429, 1438 (11th Cir.1991); *Spulak v. K Mart Corp.,* 894 F.2d 1150, 1157 (10th Cir.1990); *Hansard v. Pepsi–Cola Metro. Bottling Co.,* 865 F.2d 1461, 1469 (5th Cir.), *cert. denied,* 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989).

Reinstatement coupled with back pay reestablishes the employment relationship and returns discharged employees to their rightful place where they would have been had it not been for the wrongful discharge. Since we find nothing in the Supreme Court opinions to the contrary, we hold that Tennessee courts do, in fact, have the equitable remedy of reinstatement available to them in *Clanton*-type cases. In addition, we also find that reinstatement, where feasible, is the preferred remedy.

### The Feasibility of Reinstatement

██ Although reinstatement is preferred, the courts have recognized several circumstances where reinstatement may not be feasible. The most common circumstances are where the employer has demonstrated such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible, *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1423 (4th Cir.1991); *Spulak v. K Mart Corp.*, 894 F.2d at 1157; Peter Janovsky, Note, *Front Pay: A Necessary Alternative to Reinstatement Under the Age Discrimination in Employment Act*, 53 Fordham L.Rev. 579, 596 (1984) ("Janovsky"), and where no comparable job is available. *Wilson v. S & L Acquisition Co., L.P.*, 940 F.2d at 1438; *Duke v. Uniroyal, Inc.*, 928 F.2d at 1423; *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1346 (9th Cir. 1987).

The courts have also recognized that reinstatement may not be appropriate when it disrupts the employment of others, *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822 (5th Cir.1990), or when the employment relationship has been irreparably damaged by animosity associated with the litigation. *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 890 (3d Cir.1984); *Whittlesey v. Union Carbide Corp.*, 742 F.2d at 728.[9] In addition, the courts have declined to order reinstatement when the plaintiff is relatively close to retirement, *McNeil v. Economics Lab., Inc.*, 800 F.2d 111, 118 (7th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), or when the plaintiff is a high management employee. *Dickerson v. Deluxe Check Printers*, 703 F.2d 276, 280 (8th Cir.1983); *Cancellier v. Federated Dep't Stores*, 672 F.2d 1312, 1315 (9th Cir.), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982).

Employees are not required to accept unreasonable reinstatement offers. But, when an employer has made a bona fide offer, the employee has the burden of demonstrating that reinstatement is not feasible. *Hansard v. Pepsi–Cola Metro. Bottling Co.*, 865 F.2d at 1469. An unreasonable refusal to accept a feasible reinstatement offer seriously undermines the employee's entitlement to damages. *O'Donnell v. Georgia Osteopathic Hosp., Inc.*, 748 F.2d 1543, 1550 (11th Cir.1984).

### Front Pay

██ The remedy of front pay is not yet twenty years old.[10] It is a special remedy, not necessarily warranted in every case but reserved for only the most egregious circumstances. *Lewis v. Federal Prison Indus., Inc.*, 953 F.2d 1277, 1281 (11th Cir. 1992); *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 923 (6th Cir.1984). It is not intended to be punitive, *Hansard v. Pepsi–Cola Metro. Bottling Co.*, 865 F.2d at 1469, or to provide an employee a windfall. *Lewis v. Federal Prison Indus., Inc.*, 953 F.2d at 1281.

In cases where reinstatement is not feasible, front pay is intended to assist in making a discharged employee whole by complementing a back pay award. While back pay is intended to provide an award for injuries occurring prior to trial, front pay is an award for future injury that may occur after trial. It is, simply, an award of prospective damages for the loss of future earnings. *Hansard v. Pepsi–Cola Metro. Bottling Co.*, 865 F.2d at 1469; *Davis v. Combustion Eng'g, Inc.*, 742 F.2d at 922; *Whittlesey v. Union Carbide Corp.*, 742 F.2d at 727–28.

██ Front pay awards do not lend themselves to precise calculation. They are generally the product of intelligent guess-work because of the uncertainties surrounding an employee's future at his or her old job and the employee's prospective earnings in alternative employment. *Sellers v. Delgado College*, 781 F.2d 503, 505

---

9. The discord between the parties must rise above the friction normally associated with litigation. *McIntosh v. Jones Truck Lines, Inc.*, 767 F.2d 433, 435 n. 1 (8th Cir.1985); *Piekarski v. Home Owners Sav. Bank F.S.B.*, 752 F.Supp. 1451, 1456 (D.Minn.1990).

10. It first appeared in 1973 in a Title VII case, *United States v. United States Steel Corp.*, 371 F.Supp. 1045 (N.D.Ala.1973). Gregg N. Grimsley, Note, *Front Pay—Prophylactic Relief Under Title VII of the Civil Rights Act of 1964*, 29 Vand.L.Rev. 211, 224 (1976) ("Grimsley").

(5th Cir.1986) ("intelligent guesswork"); Janovsky, 53 Fordham L.Rev. at 610–11.

The United States Court of Appeals for the Fourth Circuit has pointed out that

> In circumstances ... where employment is terminated without destroying the capacity to work, the nature and extent of injury is nearly indeterminable. The broad array of potential circumstances of a terminated employee's future income makes any attempt at finding damages a speculative venture. The question of whether the discharged employee will ever work again despite his best efforts or will obtain gainful employment in two years, or immediately, is not something that is within the realm of fact finding. To have a jury thus compute a number without regard to reasonably certain predictions of actual injury is foreign to established principles of legal damages.

*Duke v. Uniroyal, Inc.*, 928 F.2d at 1423. But even though front pay awards may be uncertain, they are not so speculative that they should not be available in proper cases. *Whittlesey v. Union Carbide Corp.*, 742 F.2d at 728.

Courts have considered one or more of the following factors in order to keep the speculation surrounding a front pay award in check: (1) the employee's future in his or her old job, (2) the employee's work and life expectancy, (3) the employee's obligation to mitigate his or her damages, (4) the availability of comparable employment opportunities and the time reasonably required to find another job, and (5) the amount of any award for liquidated or punitive[11] damages. *Fite v. First Tenn. Prod. Credit Corp.*, 861 F.2d 884, 893 (6th Cir.1988).

### The Role of the Jury

■ Tenn. Const. art. 1, § 6 preserves the right to a jury trial as it existed at common law. *State v. Hartley*, 790 S.W.2d

276, 277–78 (Tenn.1990); *Harbison v. Briggs Bros. Paint Mfg. Co.*, 209 Tenn. 534, 541, 354 S.W.2d 464, 467 (1962). Thus, there is no right to trial by jury in essentially equitable actions unless they were triable by a jury when the Constitution of 1796 was adopted. *Town of Smyrna v. Ridley*, 730 S.W.2d 318, 321 (Tenn.1987).

■ However, Tenn.Code Ann. § 21-1-103 (1980) provides a broad statutory right to a jury trial in equity cases. *Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 336 (Tenn.1984). It states:

> Either party to a suit in chancery is entitled, upon application, to a jury to try and determine any material fact in dispute, save in cases involving complicated accounting, as to such accounting, and those elsewhere excepted by law or by provisions of this Code, and all the issues of fact in any proper cases shall be submitted to one (1) jury.

It is important to note that the statutory right extends only to the determination of any material facts in dispute and that the court may deny a request for a jury in "cases of such a complicated and intricate nature involving mixed questions of law and fact not suitable for solution by a jury." *Moore v. Mitchell*, 205 Tenn. 591, 597, 329 S.W.2d 821, 824 (1959).

The Supreme Court has held that the following types of issues should not be submitted to a jury: whether a local board of education negotiated in good faith under the Education Professional Negotiations Act, *Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d at 338 or whether a party has made out an estoppel or laches defense. *Moore v. Mitchell*, 205 Tenn. at 597, 329 S.W.2d at 824; see also *Frye v. Postal Employees Credit Union*, 713 S.W.2d 324, 326 (Tenn.Ct.App.1986).

---

11. The Age Discrimination in Employment Act permits federal courts to award "liquidated damages" in addition to compensatory damages. These liquidated damages are intended to penalize the employer, *Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1159 (6th Cir.1991), and thus they resemble punitive damages. The federal courts have held that a substantial award of liquidated or punitive damages may render front pay inappropriate or excessive. *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir.1992); *Tennes v. Massachusetts Dep't of Revenue*, 944 F.2d 372, 381 (7th Cir.1991); *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 616 (1st Cir.1985).

█ Reinstatement is an equitable remedy, *Wilson v. S & L Acquisition Co., L.P.*, 940 F.2d at 1438; *Deloach v. Delchamps, Inc.*, 897 F.2d at 823–24, and front pay is an equitable substitute for reinstatement. *Dominic v. Consolidated Edison Co. of N.Y., Inc.*, 822 F.2d 1249, 1253 (2d Cir.1987). Even though front pay is an award for monetary relief, it is still an equitable remedy. *Fortino v. Quasar Co.*, 950 F.2d 389, 398 (7th 1991); *Haskins v. City of Boaz*, 822 F.2d 1014, 1015 (11th Cir.1987); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 796 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *see also* 1 *Pomeroy's Equity Jurisprudence* § 237(e) (Spencer W. Symons ed., 5th ed. 1941) (monetary damages are permissible when equitable relief is impossible or impractical).

█ The federal courts disagree concerning whether a jury should decide the amount of front pay awards in Title VII or ADEA cases. A majority of the circuit courts follow the rule that the trial court, not the jury, should decide whether front pay should be awarded and, if so, the amount. *Walther v. Lone Star Gas Co.*, 952 F.2d at 127; *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1426 (10th Cir. 1991); *Duke v. Uniroyal, Inc.*, 928 F.2d at 1421–22; *Deloach v. Delchamps, Inc.*, 897 F.2d at 824.

This court followed the minority rule in an age discrimination case brought under the Tennessee Human Rights Act because we found nothing in the Act "to suggest that the court, and not the jury, should set the amount of 'front pay' damages and leave the other damages to be set by the jury." *Krause v. R.R. Donnelley & Sons Co.*, App. No. 89–296–11, slip op. at 13–14, 15 T.A.M. 14–8, 1990 WL 18186 (Tenn.Ct. App. Mar. 2, 1990) (no Tenn.R.App.P. 11 application filed). We now depart from this holding.

The choice between reinstatement and front pay is not a question of fact but rather a choice between remedies. Choosing the remedy which, under the facts of a particular case, is more likely to make an employee whole without awarding a windfall is particularly within the province of the court. When other forms of equitable relief are not feasible, damages are appropriate. Determining the amount of front pay damages requires the calm and deliberate balancing of many factors. It is sufficiently intricate and complex that it requires a decision by the court rather than submission to the jury.

### C.

█ The Supreme Court has already decided that discharging an employee in retaliation for seeking workers' compensation benefits subjects an employer to punitive damages. *Clanton v. Cain–Sloan Co.*, 677 S.W.2d at 445. Since the trial, the Supreme Court has established new procedures for assessing punitive damages that apply to this case. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn.1992).

We find that Mr. Sasser's evidence could support an award of punitive damages because the finder-of-fact could find that Mr. Sasser has proved by clear and convincing evidence that Averitt acted intentionally and maliciously when it discharged him. *Hodges v. S.C. Toof & Co.*, at 900–01. However, the award in this case must be set aside because the procedures followed by the trial court in submitting the issue to the jury do not comply with the new guidelines. The trial court did not bifurcate the consideration of the damage questions, *Hodges v. S.C. Toof & Co.*, at 901–02; its instructions are not consistent with the new instructions, *Hodges v. S.C. Toof & Co.*, at 901–02; and it did not review and set forth its reasons for approving or decreasing the punitive damage award. *Hodges v. S.C. Toof & Co.*, at 902.

### V.

█ In cases where both equitable and legal remedies are demanded, the court should first submit the case to the jury to resolve liability, legal damages, and all material factual disputes. Thereafter, the court should itself resolve the issues involving equitable relief. *See Ross v. Bernhard*, 396 U.S. 531, 537–38, 90 S.Ct. 733, 737–38, 24 L.Ed.2d 729 (1970); *Duke v.*

*Uniroyal, Inc.,* 928 F.2d at 1422; *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1100–01 (8th Cir.1982).

We have already determined that the evidence supports the jury's determination that Averitt discharged Mr. Sasser in retaliation for his filing suit rather than accepting the settlement proposed by Fireman's Fund. Thus, we remand the case to the trial court for a trial on the question of damages only in accordance with the following procedures.

■ After empaneling a jury, the trial court should permit the parties to present evidence concerning (1) Mr. Sasser's entitlement to back pay and the amount,[12] (2) Averitt's liability for punitive damages, (3) the feasibility of reinstatement, and (4) Averitt's liability for and the amount of front pay. Following the conclusion of the proof and disposition of the post-trial motions, the jury should be instructed to return a general verdict on compensatory damages, to decide whether Averitt is liable for punitive damages, and to resolve any specific factual issues with regard to the feasibility of reinstatement or front pay.

If the jury determines that punitive damages are warranted, the trial court should permit the parties to introduce proof concerning the amount. The jury should then determine the amount of punitive damages guided by the instructions required by *Hodges v. S.C. Toof & Co.* The trial court must then review and either approve or modify the punitive damage award.

Following the jury's determination of the amount of punitive damages, or if the jury determines that Averitt should not be required by pay punitive damages, the trial court should also decide whether reinstatement is feasible in light of all the facts. If reinstatement is feasible, then the court should order Averitt to reinstate Mr. Sasser under whatever conditions it deems proper. If reinstatement is not feasible,

the trial court should decide whether Mr. Sasser is entitled to front pay and, if so, the amount.

## VI.

We affirm the jury's verdict finding that Averitt discharged Mr. Sasser in retaliation for his pursuing his workers' compensation benefits but vacate the damage award and remand the case for a trial on the issue of damages only in accordance with this opinion. We tax the costs of this appeal in equal proportions to Anthony Sasser and to Averitt Express and its surety for which execution, if necessary, may issue.

TODD, P.J., and F. LLOYD TATUM, Special Judge, concur.

---

12. This proof will necessarily include proof regarding Averitt's offer of reinstatement and the reasonableness of Mr. Sasser's refusal to accept the offer. An unreasonable rejection of a feasible offer will limit the amount of the back pay and will prevent an award of front pay. *See*

*Ford Motor Co. v. EEOC,* 458 U.S. 219, 228–29, 102 S.Ct. 3057, 3063–64, 73 L.Ed.2d 721 (1982); *Hill v. Winn–Dixie Stores, Inc.,* 934 F.2d 1518, 1522 (11th Cir.1991); *O'Donnell v. Georgia Osteopathic Hosp., Inc.,* 748 F.2d at 1550; *Davis v. Combustion Eng'g, Inc.,* 742 F.2d at 923.