IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 10, 2000 Session

# BONNIE ELLIOTT v. THE BLAKEFORD AT GREEN HILLS

**Appeal from the Circuit Court for Davidson County**
**No. 99C-272     Thomas W. Brothers, Judge**

_____

**No. M2000-00365-COA-R3-CV - Filed December 13, 2000**

_____

The Director of Food Service at the defendant retirement home injured her hand on the job, and was terminated by her supervisor.  She filed suit against her employer, claiming that she had been discharged in retaliation for making a workers' compensation claim.  At the close of the plaintiff's proof, the trial court granted the defendant's motion for directed verdict.  We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Ernest W. Williams and Dana C. McLendon, III, Franklin, Tennessee, for the appellant, Bonnie Elliott.

C. Eric Stevens and Robert F. Goldman, Nashville, Tennessee, for the appellee, The Blakeford at Green Hills.

## OPINION

## I.
### A WORK-RELATED INJURY

The Blakeford at Green Hills, a Nashville retirement home, recruited Bonnie Elliott to be its new Director of Food Services.  She began work on August 28, 1997.  The fifty-two year old Ms. Elliot had spent her entire working career in food service. Prior to coming to work at the Blakeford, she had served thirteen years as Food Services Manager at another retirement home, Park Manor Presbyterian Apartments, followed by two years of work for the Williamson County School System. During her stint with the county, she had to undergo surgery for a ganglion cyst on her left hand.

Ms. Elliott described herself as a "hands-on" manager. This turned out to be important, as she discovered the kitchen at the Blakeford to be unsanitary, the staff poorly trained, and the facility poorly organized. Ms. Elliott found herself working thirteen or fourteen hours a day, six or seven days a week, to feed the Blakeford's residents, who included individuals living in independent housing units, in assisted living, and in a skilled nursing facility. She supervised 35-40 food service workers as they prepared and served three meals a day, and pitched in with her own labor whenever it was necessary, including cooking, stocking, waiting tables, and even washing dishes.

On October 6, 1997, Ms. Elliot was helping some of her workers stock cartons of institutional-sized food cans, when she felt the fingers on her left hand go completely limp. Although she thought that she was hurt, she didn't know the extent of her injury until shortly thereafter, when she attempted to lift a plate of food from a serving counter, and dropped it because she could not grip it. She went to the on-site infirmary for first aid, and told the nurse on duty that she had injured her hand on the job. The nurse directed her to seek medical attention from her personal physician.

She called the office of Doctor Joseph Chenger, to ask if she could get an appointment that day. She then went to see Mr. Dan Goldstein, the acting Executive Director of the Blakeford, and told him "I've hurt my hand in the kitchen." According to Ms. Elliott's testimony, she was surprised when Mr. Goldstein did not respond to this news in any way. When Dr. Chenger's office called back to let Ms. Elliott know that he would be able to see her that day, she returned to Mr. Goldstein's office to inform him that she had to leave the premises for medical attention, but that she would be back as soon as she could. Again, Mr. Goldstein said nothing at all.

## II.
### BONNIE ELLIOTT LOSES HER JOB

Dr. Chenger diagnosed Bonnie Elliott with the rupture of one or more of the extensor tendons in her left hand. He put her hand in a splint, and informed her that she would need surgery in the near future to repair the rupture. Ms. Elliott telephoned the Blakeford and told Mr. Goldstein about the diagnosis and her need for surgery, and then returned to work. The following day, she sought out Mr. Goldstein to discuss the injury and its implications. She asked if her medical insurance would cover the cost of the surgery, and Mr. Goldstein replied that she had no insurance coverage of any kind available from the Blakeford because she was still within the probationary period of the facility's health insurance plan.

Ms. Elliott continued to press Mr. Goldstein for some help with the costs of her surgery, but he was adamant that she would not be receiving any help. Finally, she suggested that a possible source of insurance for the surgery she needed might be COBRA coverage available from the Williamson County Schools. Mr. Goldstein replied "that's the thing to do." The following day, Ms. Elliott paid almost $600 to obtain COBRA coverage from her former employer.

Ms. Elliott continued to work with a splint until the day of her surgery, October 16, 1997. She took that day off for the operation, and the following day for recovery, and then returned to work with her left hand in a post-surgical cast. She did not miss any other workdays until the events described below.

After serving dinner on November 3, 1997, Ms. Elliott was summoned to Mr. Goldstein's office. According to Mr. Goldstein's account of their private conversation, Ms. Elliott told him that she just couldn't do the work anymore, and would have to resign. Mr. Goldstein alleges that he told her that he didn't think that was necessary, but that if she was certain, she needed to write a letter of resignation. She allegedly then held up her arm and told him she could not write, so he allowed her to dictate a letter of resignation to him.[1]

According to Ms. Elliott, Mr. Goldstein stated that she seemed to be having a tough time with work, and he indicated to her, without specifically saying so, that her employment was being terminated. When she began to understand his drift, he took a pad from his desk, and asked her how she wanted to word her "resignation." She then told him that she was not resigning, and she therefore did not care what he wrote on his pad.

When she clearly understood that she was being fired, Ms. Elliott said, "I cannot work, you owe me something – workers' compensation, unemployment, disability, something, I need help," and Mr. Goldstein responded, "that seems fair." A few days later, Ms. Elliott met with an administrator from the Blakeford and filled out the First Report of Injury, a necessary step in filing a workers' compensation claim. Tenn. Code. Ann. § 50-6-201.

Shortly thereafter, Ms. Elliott received a letter from Mr. Goldstein which read: "Per your request, please find a typed letter of resignation. Please sign and return to me so that our files are up to date." Ms. Elliott did not sign or return the enclosed letter of resignation.

### III.
#### PROCEEDINGS IN THE TRIAL COURT

On October 20, 1998, Bonnie Elliott filed a complaint for retaliatory discharge in the Williamson County Circuit Court. The case was subsequently transferred to Davidson County. The defendant filed a Motion for Summary Judgment, which was denied. On January 10, 2000, a jury was empaneled and the case went to trial.

The plaintiff's attorney presented the testimony of Dan Goldstein by reading portions of his deposition to the jury. Bonnie Elliott was the only witness he called to the stand. After she testified at length on direct and cross-examination about the circumstances of her employment and her discharge from the Blakeford, he closed his proof, and the defendant moved the trial court for a

---

[1] The proof showed that Ms. Elliott was actually right-handed, thus throwing Mr. Goldstein's entire account in doubt.

directed verdict pursuant to Rule 50.02, Tenn. R. Civ. P. The trial court heard arguments on the motion, and then dismissed the case on directed verdict, finding that the plaintiff had failed to make a prima facie case of retaliatory discharge. This appeal followed.

## IV.
### RETALIATORY DISCHARGE
#### A. ELEMENTS OF THE CAUSE OF ACTION

The Tennessee Supreme Court first recognized a cause of action for retaliatory or wrongful discharge in the case of *Clanton v. Cain-Sloan*, 677 S.W.2d 441 (1984). The court noted that retaliatory discharge was not specifically mentioned in the Workers' Compensation Act, Tenn. Code. Ann. § 50-6-101 et seq., but reasoned that if employers could freely discharge any employee who was attempting to exercise his rights under the Act, this would have the effect of circumventing the entire legislative scheme.

Tenn. Code. Ann. § 50-6-114 reads, "no contract or agreement, written or implied, or rule, regulation or other device, shall in any manner operate to relieve any employer in whole or in part of any obligation created by this chapter, except as herein provided." Further, Tenn. Code. Ann. § 50-6-116 states that the Act "shall be given an equitable construction by the courts to the end that the objects and purposes of this chapter may be realized and attained."

The Court found retaliatory discharge to be a device of the type barred by Tenn. Code. Ann. § 50-6-114, and ruled that an employer could be compelled to answer in damages for discharging an employee because of the employee's exercise of rights under the Workers' Compensation Act. The Court reasoned that without such a cause of action, the purposes of the Act could not be achieved.

In a later case, *Sasser v. Averitt Express*, 839 S.W.2d 422, 426 (Tenn. Ct. App. 1992), this court discussed the elements for establishing a retaliatory discharge, and described them as follows: "An employee must prove: (1) that he or she was employed by the defendant, (2) that he or she sought workers' compensation benefits, (3) that the defendant discharged him or her, and (4) that the request for workers' compensation benefits was a substantial motivating factor in the defendant's discharge decision." *See also*, *Anderson v. Standard Register Co.*, 857 S.W.2d 555 (Tenn. 1993).

While the Workers' Compensation Act sets out specific procedures to follow when applying for benefits, we did not define the exact steps an employee must take in order to be deemed to have "sought workers' compensation benefits" for purposes of a retaliatory discharge action. This was not an oversight. Keeping that requirement flexible protects the employee from an employer who might be tempted to evade the law by obstructive tactics or by discharging her before she can take any specific steps.

In the present case, the trial judge granted the defendant's motion for directed verdict because he believed that the plaintiff did not present sufficient evidence to prove the second and

fourth elements required for retaliatory discharge under *Sasser v. Averitt Express*, supra. The court found that there was no proof that Ms. Elliott had explicitly asked for workers' compensation benefits until after her employment was terminated, and no direct proof that a claim for such benefits was a motivating factor in her discharge. We believe, however, that when the strict standards for directed verdict are applied to the unusual circumstances of this case, the problems that so concerned the trial court do not prove to be fatal to the plaintiff's claim.

## B. STANDARDS FOR DIRECTED VERDICT

A directed verdict should only be granted by a trial court where there is no material evidence in dispute, and a reasonable mind could draw but one conclusion. The standards for ruling on a motion for directed verdict were discussed at length in *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994):

> [T]he court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied. (Citations omitted)

We must examine the evidence and the possible inferences arising from it in light of the above standard, to determine whether the appellant has succeeded in establishing a prima facie case of retaliatory discharge.

## C. THE REQUIREMENT OF SEEKING BENEFITS

When the plaintiff notified Mr. Goldstein that she had injured her hand on the job and needed medical attention, that triggered an affirmative obligation on his part under the workers' compensation law to furnish her with whatever medical treatment she might reasonably require, free of charge. Tenn. Code. Ann. § 50-6-204(a)(1). He should also have provided her with a list of three or more physicians or surgeons from which she could choose to receive treatment. Tenn. Code. Ann. § 50-6-204(a)(4).

Ms. Elliott testified as to three occasions when she told Mr. Goldstein that she had hurt her hand on the job, and it is uncontroverted that he never offered her the medical help required by the Workers' Compensation Law. To the contrary, when she asked him what type of insurance coverage was available to her, Mr. Goldstein stated that she had no coverage whatsoever. When she finally suggested that she might be able to acquire COBRA coverage from her previous employer, he agreed, and she purchased the coverage at her own expense.

We note that it is a violation of law, punishable by a fine of $500 and other penalties against any employer who "knowingly, willfully, and intentionally causes a medical or wage loss claim to be paid under health or sickness and accident insurance, when the employer knew that the claim arose out of a compensable work-related injury and should have been submitted under its workers' compensation insurance coverage." Tenn. Code. Ann. § 50-6-128.

The defendant's attorney argues that since Ms. Elliott did not mention workers' compensation until after she understood that her employment was being terminated, she failed to satisfy the second element of a retaliatory discharge action. He notes she was familiar with the workers' compensation law, because in her previous job at Park Manor Presbyterian Apartments, she had to fill out the First Report of Injury for an employee under her supervision who was injured on the job. From her testimony, however, it appears that she did not specifically ask for workers' compensation because she either believed that as a salaried or "non-exempt" employee she was not eligible, or that as a manager it was not appropriate for her to ask for it.

Mr. Goldstein's deposition indicates that he is a seasoned executive, with extensive experience in retirement home management. There can be no doubt that he was familiar with at least the broad outlines of the workers' compensation scheme. The proof showed that Ms. Elliott told him at least three times that she had been injured on the job. Yet when she asked him what kind of insurance was available for her medical expenses, he told her she had no coverage whatsoever.

Mr. Goldstein's failure to take any of the steps required by law when Ms. Elliott told him she had been injured in the kitchen could be explained by an inference that he did not want to be the first to bring up the possibility of workers' compensation in hopes that she would not mention it. It appears to us that Mr. Goldstein's deliberate silence and subsequent misdirection can constitute a "device" under Tenn. Code. Ann. § 50-6-114 to evade the obligations of the Workers' Compensation Act, and that Ms. Elliott should not be deemed to have waived her rights by failing to raise the subject of workers' compensation until a few moments after she realized she had been terminated.

### D. THE EMPLOYER'S MOTIVATIONS

Ms. Elliott testified that she was fired, while Mr. Goldstein testified that she voluntarily resigned. The defendant's attorney concedes that under the standards for directed verdict, we are compelled to credit her account rather than his. He does not mention that we may also infer that Mr. Goldstein testified as he did because he knew that if he could persuade the court that Ms. Elliott had indeed resigned her position, then she could have no viable claim for retaliatory discharge.

The trial court stated that it found the Supreme Court's rationale in the case of *Conatser v. Clarksville Coca-Cola Bottling Company,* 920 S.W.2d 646 (1995) to be controlling. In that case, a probationary employee of the defendant was injured on the job. He was paid workers' compensation temporary total disability for the two and a half weeks he was unable to work. Three days after returning to the job, he was discharged. Mr. Conatser claimed that he was fired in retaliation for filing a workers' compensation claim, while the bottling company claimed it

terminated him because his injury rendered him incapable of performing the physically demanding job. The trial court granted a directed verdict to the defendant, and this court affirmed, because there was no material evidence that Mr. Conatser's claim was a substantial factor in his termination.

We believe the present case is easily distinguishable. In *Conatser,* the plaintiff insisted that his discharge only three days after returning to work constituted a prima facie showing that he was being retaliated against for the assertion of a workers' compensation claim. There was apparently no other evidence from which one could raise an inference of retaliation. In the present case, however, the testimony of the defendant's own agent raises a permissible inference that he was acting from improper motive.

Further, the proof indicates that Ms. Elliott, unlike Mr. Conatser, could do her job despite her injury. In fact, Mr. Goldstein specifically testified that Ms. Elliott was capable of continuing to perform her duties as Director of Food Service with her hand in a sling. While he acknowledged that her injury made it more difficult for her to continue with the "hands on" approach that she favored, he also testified that such an effort was not a necessary part of the job. He also testified that she was well qualified for the job, that she performed it competently and properly, and that she never had to disciplined.

As the defendant points out, the burden of proof in a retaliatory discharge case lies first with the plaintiff to produce some evidence of retaliatory motive. *Anderson v. Standard Register Co.*, 857 S.W.2d 555 (Tenn. 1993). Our courts have recognized, however, that direct evidence of such motive is hard to come by, and that we usually rely upon inferences that arise from indirect evidence. The Supreme Court discussed that situation in the case of *Mason v. Seaton*, 942 S.W.2d 470 (Tenn. 1997).

> "Evidence of that motivation is largely within the possession of the defendants. Consequently, where, as in this case, the plaintiff's claim for causation is consistent with the facts and circumstances shown, and the employer chooses to offer no explanation for the employee's discharge, fairness requires that any credible evidence from which the trier of fact could infer causation will defeat the motion for summary judgment."

942 S.W.2d at 474.

Although the retaliatory discharge in *Mason v. Seaton* did not arise from a workers' compensation claim, but rather from the plaintiff's disclosure of the unsafe practices of her employer to the police and fire departments, the court's observations regarding proof of motivation are as applicable to Ms. Elliott's claim is as they were to Ms. Mason's. It appears to us that Ms. Elliott has made out a prima facie case of retaliatory discharge, and that the trial court erred in granting the defendant a directed verdict.

## VI.

The order of the trial court is reversed. Remand this cause to the Circuit Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, The Blakeford at Green Hills.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.