IN THE COURT OF APPEALS OF TENNESSEE

WESTERN SECTION AT JACKSON



FILED

Jan. 13, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

_____

|  |  |  |
|---|---|---|
| MICHAEL MORAT, individually, | ) | Shelby County Circuit Court |
| and MORAT'S INSURANCE AGENCY, | ) | No. 25650 T.D. |
| INC., a Tennessee Corporation, | ) | |
|  | ) | |
| Plaintiffs-Appellants, | ) | |
|  | ) | |
| v. | ) | C.A. NO. 02A01-9412-CV-00270 |
|  | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | |
| INSURANCE COMPANY, | ) | |
|  | ) | |
| Defendant-Appellee. | ) | |

_____

From the Circuit Court of Shelby County at Memphis,
**Honorable Wyeth Chandler, Judge**

**Eugene C. Gaerig,**
Memphis, Tennessee
Attorney for Plaintiffs-Appellants.

**Fred P. Wilson,**
WILSON, McRAE, IVY, McTYIER AND STRAIN, Memphis, Tennessee
and
**Alan Strain,** Memphis, Tennessee
Attorneys for Defendant-Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FRANKS, J.**

**FARMER, J.:** (Concurs)
**TOMLIN, SR. J.:** (Concurs)

In this action for malicious prosecution, the Trial Judge granted the defendant summary judgment, and plaintiffs have appealed.

Plaintiff Michael Morat is an insurance agent with the Morat Insurance Agency, Inc., in Memphis. The genesis of this dispute occurred in 1981, when plaintiffs sent a policy change request form to defendant to change the motor vehicle insured by defendant under the assigned risk plan through this agency for the insured, J.W. Whitten. Whitten was in the process of purchasing a 1981 Cadillac and plaintiffs, after exploring the possibility of insurance from other companies, agreed to Whitten's request to apply to substitute the 1981 Cadillac for the motor vehicle on the existing assigned risk policy. Michael Morat filled out the application for change, which Whitten signed. The plaintiff noted on the form that it was a replacement vehicle and in the application in the space for ?cost new?, the plaintiff filled in $25,000.00. In a box on the form, plaintiff noted that the vehicle had not been altered. Upon defendant's receipt of the application, the change was processed and the 1981 Cadillac became the insured vehicle.

Less than two months later the vehicle burned and a claim was made to defendant. Upon investigation of the loss, defendant determined that the vehicle had been

2

substantially altered, which increased its value to over $40,000.00. Defendant ultimately settled with the loss payee for an amount in excess of $24,000.00 and then brought an action against the agent and agency on the theory that had the true value of the vehicle been represented, defendant would not have insured the vehicle, because the assigned risk plan does not require an insurance company to insure a motor vehicle for more than $25,000.00, and it was defendant's policy not to insure vehicles costing in excess of that amount.

The case against plaintiffs went to trial with a resulting judgment in their favor, whereupon they brought this action for malicious prosecution.

Numerous and exhaustive depositions were taken along with exhibits filed and defendant moved for summary judgment, which the Trial Judge granted on the ground that defendant had reasonably relied on advice of counsel. On that basis, the Court concluded there was ?probable cause? to file suit against plaintiffs herein.

On appeal, plaintiffs insist there are genuine issues of material fact ?as to lack of probable cause, malice, and advice of counsel?. While there are more than 4,000 pages in the record before us, we do not find any genuine issue as to any material fact as contemplated in Rules of Civil Procedure, Rule 56. For purposes of a summary judgment, the plaintiffs' deposition is to be taken as true, and Michael Morat testified in pertinent part:

> Q.   Were you advised by Huffman on August 31, 1981 of the value of the automobile?

3

A.      My notation shows that he gave me a cost of
        the automobile.

Q.      What did he tell you?

A.      $49,900.00.

.   .   .

Q.      Well, then you next called State Farm, is
        that right?

A.      That's correct.

Q.      Who did you call at State Farm?

A.      I called and asked for the Tennessee Assigned
        Risk Underwriting Department.

.   .   .

Q.      Did you tell this person you were speaking to
        the figure Huffman had told you of
        $49,900.00?

A.      I did.

Q.      What exactly did you say?

A.      I explained to the man that I spoke to that
        this man is - Mr. Whitten is purchasing this
        automobile, and because of the value, I
        needed to know what to do with this policy,
        whether they would substitute the automobile,
        or what they would do with it.

Q.      What were you told?

A.      He explained to me that under the insurable
        interest of the car under the actual as far
        as the value of the automobile, less any
        custom equipment, they would protect the car
        for no more than $25,000.00.

.   .   .

Q.      Can you explain it to me?  Can you explain to
        me what you are saying to me, can you explain
        what they told you they would insure it for?

A.      They said they would only insure it up to the
        value of the automobile, less any custom
        equipment for a like make and model of a 1981
        Cadillac Seville.

Q.      Was the $25,000.00 figure in there somewhere?

4

A.    No, sir. The policy - they would not insure a vehicle over $25,000.00 less any custom equipment.

. . .

Q.    So on August 31 you did not know the cost of the custom modifications on this vehicle?

A.    No, sir. The only cost I knew was the cost of that car, of what the dealership was trying to sell that automobile for the customer at.

Q.    That would be $49,900.00?

A.    Yes, sir.

Q.    But you knew that there were custom modifications?

A.    I knew there were custom modifications on the automobile. Yes, sir.

. . .

Q.    Did you know Whitten was coming in on the 4th?

A.    No, sir. I didn't.

Q.    But he came in?

A.    He came in on the 4th.

Q.    What did he say, and what did you say on the 4th when he came into your office?

A.    He came into my office, and I advised him at that time we have got to make some changes on your auto policy, and he said ?that's why I'm here?.

. . .

Q.    Did you complete an application on the 4th?

A.    I did.

Q.    And did Whitten sign it?

A.    I completed a Tennessee Automobile Insurance Plan Change Endorsement form, or Policy Change Request, as they call it.

      We took down the pertinent information on the policy. We checked off that this was a

5

replacement vehicle on the particular policy
number, an '81 Cadillac Seville. We listed
the lienholder, change of address for him.
He signed it and I witnessed his signature.

. . .

Q. Is this change form different from the
initial policy application?

A. Yes, sir. It is.

Q. This form has a space on it for ?cost new?,
and written in the space is $25,000.00. Is
that in your writing?

A. Yes, it is.

Q. Why did you put $25,000.00 in the ?cost new?
blank on this change request form?

A. I put $25,000.00 because this is the amount
of what the company would protect up to for
an automobile like the make and model of an
'81 Cadillac Seville, less any custom
equipment.

. . .

Q. Did he [underwriter] tell you to put
$25,000.00 in this blank?

A. I put $25,000.00 sir, to protect and limit
the customer from coming back, also, and
being able to claim higher if this thing
should be totaled out, and then in addition
to it, I had him also sign this letter here
so there would be no question about it.

. . .

Q. I see a box for ?altered, yes or no? on the
policy change request, and is it marked ?no?.
Is that your mark?

A. Yes, sir. I marked it.

Q. Why did you mark it ?no??

A. Because the automobile that the policy
insures goes back to a 1981 Cadillac Seville,
less any custom equipment.

Q. What do you understand that ?altered? box to
mean?

A. It means any alterations done to the

6

automobile or custom equipment.

Defendant sought advice of counsel on bringing suit against plaintiffs and the law firm employed by defendant recommended and ultimately brought the action. The attorneys, in reaching their conclusion, had other facts to consider relative to plaintiffs' handling of the matter. Plaintiff did not inform defendant of his conversation with an underwriter until the following spring, and defendant was unable to verify any conversation with its underwriters through its investigation. Shortly after the loss, an investigator took plaintiff's statement, wherein plaintiff was asked:

> Q. Another thing I want to question you on the application I got a photostatic copy of, you put on there costing you $25,000.00 in actual cost was $42,000.00 something. What were the reasons for doing this on the applications instead of putting the full amount?
>
> A. Because Mr. Whitten agreed that this was the price he wanted to show under the terms of this policy change request, any time that the customer acknowledges this, this is what he has wanted to do.

The Supreme Court in *Roberts v. Federal Express Corp.*, 892 S.W.2d 246 (Tenn. 1992), held that the reasonableness of the defendant's conduct in bringing an action ?should be made by a jury?, and the Court said that probable cause is to be determined ?solely from an objective examination of the surrounding facts and circumstances.? Since the surrounding facts and circumstances in the case before us are not in dispute, the issue thus becomes whether ?reasonable minds could differ as to whether probable cause existed for bringing? the action against plaintiff. *Roberts,*

7

*Id.* 249.

We note at the outset, that while the same general rules and limitations apply to an action founded upon a civil proceeding, vis-a-vis criminal proceedings, there can be significant differences:

> But obviously less in the way of grounds for belief will be required to justify a reasonable man in bringing a civil, rather than a criminal suit. Sometimes this is expressed by saying that want of probable cause must be ?very clearly proven? or ?very palatable? or that ?greater latitude? must be allowed than in a criminal case. Apparently, what is meant is merely that the instigator need not have the same degree of certainty as to the facts, or even the same belief in the soundness of his case, and that he is justified in bringing a civil action when he reasonably believes that he has a good chance of establishing it to the satisfaction of the court or the jury.

*Prosser and Keeton on Torts*, 5th Ed. §120, p. 893.

Our Supreme Court is in accord with this view, having expressed in *Kauffman v. A.H. Robbins Co.,* 223 Tenn. 515, 448 S.W.2d 400 (1969) that in civil actions the plaintiff has ?a heavy burden of proof? in establishing malice and lack of probable cause. P. 523.

In malicious prosecution actions, advice of counsel to the effect that there is a reasonable chance of recovery on a claim can establish probable cause. *See Sullivan v. Young*, 678 S.W.2d 906 (Tenn. App. 1984). In this case, the Trial Judge concluded that the defendant had acted reasonably in its investigation and in obtaining the advice of counsel as to whether it should attempt to recover from plaintiff. As we observed earlier, we are required to take the plaintiff's statements about the call to an underwriter as true, but there was ample evidence at the

8

time for the attorneys to conclude that defendant had a reasonable chance to recover in the prior action.

We conclude on this record that reasonable minds would not differ that probable cause existed for bringing the action.

Plaintiffs argue that ?discovery was improperly withheld by State Farm?, including failure to answer interrogatories and produce documents. The Rules of Civil Procedure provide procedures to compel discovery. A trial court speaks through its minutes and we find no order in this record of the Trial Court's requiring defendant to comply with additional discovery under the Rules. *Palmer v. Palmer,* 562 S.W.2d 833 (Tenn. 1978). A party will not be granted relief where he has failed to take whatever action was reasonably necessary to prevent an error. T.R.A.P. Rule 36(a).

Finally, there is yet another compelling reason the judgment should be affirmed. The underlying cause of the controversies between these parties is plaintiff's own actions. He filled in two answers in the application for insurance, known by him at the time to be false. No party should be allowed to profit from his wrongful conduct. The North Carolina Supreme Court has said it well:

> It is a maxim of law recognized and established, that ?no man shall take advantage of his own wrong; and this maxim, which is based on elementary principles, is fully recognized in courts of law and equity, and, indeed, admits of illustration from every branch of legal procedure.? *Broom's Legal Maxims*, 10th Ed., 191.
>
> ?This maxim embodied in the common law, and constituting an essential part thereof, is stated in the text books and reported cases. It has its

foundation in the universal law administered in all civilized lands, for without its recognition and enforcement by the Courts, their judgments would rightly excite public indignation.?

*In Re: Ives,* 102 S.E.2d 807, 811 (NC. 1958).

For the foregoing reasons, we affirm the judgment of the Trial Court and remand with costs of the appeal assessed to the appellant.

_____
Herschel P. Franks, J.

_____
David R. Farmer, J.

_____
Hewitt P. Tomlin, Jr., Sr. J.

10