IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 10, 2006 Session

## CNA (CONTINENTAL CASUALTY) v. WILLIAM KING, ET AL.

**Appeal from the Circuit Court for Cheatham County**
**No. 5517      Robert Burch, Judge**

---

**No. M2004-02911-COA-R3-CV - Filed on September 28, 2006**

---

A roofing contractor applied for workers compensation insurance, declaring in his application that he had no employees. He paid a $750 minimum premium, and the insurance company issued a policy. The company subsequently audited his records and assessed an additional premium of over $14,700 for roofers who worked under contract with him or his subcontractors, but who were not covered by their own workers compensation policies. The contractor refused to pay, and the insurance company brought suit. The contractor claimed at trial that all the workers were independent contractors and, thus, that he was not obligated to insure them. The trial court ruled against him. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., joined. WILLIAM B. CAIN, J., not participating.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, William King d/b/a Kustom Roofing & Consultants.

Blakeley D. Matthews, Brian W. Holmes, Nashville, Tennessee, for the appellee, CNA (Continental Casualty).

### OPINION

### I. A CONTRACT OF INSURANCE

William Stanley King operates a roofing business under the name Kustom Roofing and Consultants. He does not carry any employees on his payroll, but when a general contractor hires him to install a roof, he then hires others to do the work and pays them according to the number of roofing squares they complete.

In July of 2001, Mr. King went to an insurance agency to obtain general liability and workers compensation insurance. A general contractor, a subdivision developer for whom Mr. King intended to work, required proof that he had such insurance before it would agree to have him install its roofs. Mr. King had been refused coverage by two insurance companies in the previous sixty days.

The insurance agent asked Mr. King questions, and an application/information page was filled out purportedly based on those answers. The form stated that the applicant had no employees, and "NO" was checked in response to the questions "Are subcontractors used?" and "Is any work sublet without certificates of insurance?" Mr. King paid the minimum premium of $750 and signed the application without reading it.

The agent forwarded the application to NCCI, which administers Tennessee's assigned risk program. A few weeks later, Mr. King received a policy in the mail from CNA Continental Casualty to cover him for one full year.[1] The first part of the five page policy states that "[w]e will pay promptly when due the benefits required of you by the Workers Compensation Law," and further "[w]e have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance."

The premium portion of the policy declares that "[t]he premium shown on the Information Page, schedules and endorsements is an estimate. The final premium will be determined after this contract ends by using the actual, not the estimated, premium basis and the proper classification and rates that lawfully apply to the business and work covered by this policy."

The document further explains that the premium is calculated by multiplying a rate by a premium basis and that the most common basis is remuneration paid to officers and employees engaged in work covered by the policy, and also to "[a]ll other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy." In the absence of payroll records, the contract price for the services and materials furnished by such "other persons" can be used as the premium basis. However, this section "will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligation."

The policy further sets out the right of the insurer to examine and audit all the records relating to the policy in order to determine the final premium. Mr. King's policy carried a premium rate of $32.77 for each $100 of remuneration.

On July 31, 2001, the underwriter for CNA sent a letter to Mr. King asking him to fill out and return an enclosed questionnaire about any subcontractors he hired as part of his business. The letter underscored the policy provisions discussed above by stating:

---

[1]The evidence showed that CNA had actually contracted with St. Paul Travelers Insurance Company to write the policy. But since CNA is named as the plaintiff in this suit, any reference to CNA in this opinion will also include any role exercised or interest held by Travelers.

Please note that the **payroll for uninsured sub-contractors** will be included in your premium basis at audit unless you can provide evidence that the sub-contractor is not subject to the state workers compensation statutes and that all appropriate forms have been completed and filed with the state and with our office. (emphasis added).

On November 20, 2001, CNA sent a letter to Mr. King notifying him that the policy had been cancelled because "requested underwriting information has not been provided." It appears that Mr. King had failed to include any specific information about subcontractors in the questionnaire that he returned.[2]

An audit of Mr. King's records was conducted on December 28, 2001. It resulted in the insurer assessing him with an additional premium of $14,790 for the months that he had been insured. Mr. King refused to pay, and CNA filed a collection suit in the General Sessions Court of Cheatham County. Following a hearing in November of 2003, the General Sessions Court returned a judgment in favor of Mr. King. CNA then appealed for a trial *de novo* in the Circuit Court of Cheatham County. Mr. King filed a counterclaim, which was dismissed prior to trial.

## II. TRIAL COURT PROCEEDINGS

The trial in Circuit Court was conducted on October 22, 2004. The only witnesses to testify were the auditor who had examined Mr. King's records; an attorney for the insurer; Martin Munoz, a roofer who worked for Mr. King; and Mr. King himself.

The auditor testified that his examination revealed that during the period the insurance was in effect, Mr. King had employed two workers, Daniel Borck and William Wissman, who did not sign I-18 forms. These are documents used by subcontractors to waive their rights to be covered by workers compensation.[3] Mr. King paid them total remuneration of $10,000. Mr. King had also paid $40,488 to Martin Munoz. Mr. Munoz had filled out an I-18 form, but the amount paid suggested to the auditor the possibility that Mr. Munoz was paying other workers out of the money paid to him. In fact, this proved to be the case.

---

[2]Shortly after the policy was cancelled, one of Mr. King's workers was injured on the job and went to the hospital. Mr. King notified CNA that the injury had occurred. The insurance company declined coverage to the worker because the injury happened after the policy period ended.

[3]The forms are actually titled "Election of Non-Coverage by Sub-Contractor" and must be signed by both the subcontractor and the general contractor. Although they provide a mechanism whereby a subcontractor can waive his own right to be covered by the Workers Compensation Law, the form itself states that he cannot waive the rights of his employees. The subcontractor's signature affirms that "this election of non-coverage was not advised, counseled or encouraged by said general contractor, or anyone acting for the general contractor." The general contractor's signature affirms that "I understand that this form is for clarification for audit purposes and does not relieve the general contractor from responsibility for the subcontractor's employees in the event the subcontractor does not have coverage at the time of an accident."

Since Mr. Munoz does not speak English very well, he testified through a court interpreter. He explained that he has a continuing business relationship as a roofer with Mr. King. Rather than paying an hourly wage, Mr. King pays him by each square of roofing he completes. Mr. Munoz brings helpers with him to do the work, whom he also pays by the completed square. Under questioning, he identified four individuals that he remembered as having worked for him during the policy period: Carlos Barriga, Antonio Vences, Leopoldo Guadarrama and Jorge Alfredo. None of them had signed an I-18 form.[4]

According to Mr. Munoz, Mr. King told him that he does not provide workers compensation insurance and that he does not take income taxes or Social Security out of the money he pays. Mr. Munoz in turn tells his helpers that he does not provide workers compensation and he does not take deductions from their pay. However, he apparently reports that pay to the IRS, for five 1099 forms for the year 2001 have been entered into the record which list the payer as "Martin Munoz, M & M Roofing." The recipients of funds totaling $84,500 on those forms include some names which are identical to or similar to those of the individuals that Mr. Munoz identified as working for him during the policy period.

When Mr. King was called to the stand, his testimony was very consistent with that of Mr. Munoz. His responses to questioning at the very beginning of his testimony set out the basis for his argument that the insurer was not entitled to any additional premium from him:

Q:      ... you use laborers to do the work, the actual roofing work, correct?

A:      I use independent contractors

Q:      And it's your position that everyone who does work for you is a subcontractor, correct?

A:      Yes. Everybody that does work for me is an independent contractor.

Mr. King was closely questioned as to his involvement with the workers who actually did the roofing that he paid for and for which he was paid. He testified that he did not set their work hours, did not provide tools, and did not tell them how to do their jobs. He did ask the workers to use safety equipment, but did not require them to. Asked how much time he spent on the job site while the work was going on, he answered, "Almost never." He also stated he could fire any of the workers.

Mr. King was also questioned about the application for insurance that he had signed and about other workers compensation policies he had purchased over the years. His answers showed a lack of interest in the details of any of those policies. Asked why he did not go over the details of

---

[4]The auditor had testified that Nelson Pause and William Scott Jersen, workers listed in Mr. King's books as helpers to Mr. Munoz , had signed I-18s. However, Mr. Munoz testified that he did not know either of those men.

the application under review with the agent, he responded "I'm not an insurance agent. I'm just obtaining insurance, and it's his job to fill out all this paperwork concerning the insurance."

When the application at issue was shown to him, Mr. King admitted that the negative responses to the questions about the use of subcontractors and whether any work had been sublet without certificates of insurance were untrue. He also testified that his signature was the only handwriting in the document that he had filled in himself. However, he was impeached by his deposition testimony to the effect that he did not remember filling the form out, that some of the writing looked like his handwriting and some did not, and that he may have filled some of it out.

At the conclusion of the proof and closing arguments, the trial court announced its decision from the bench. The court held that the insurance policy at issue was a valid contract and that by its terms it obligated the insurance company to defend suits by workers employed by Mr. King or by his subcontractors who were injured on the job.

The court also stated that ". . . it's a finding of fact that the workers for the defendant, Mr. King were, under the facts that have been presented in this case, independent contractors, as were those of the subs." However, the court immediately followed this statement by noting that the issue was not clear-cut, that it would have taken a lawsuit to establish the true status of the workers, that CNA would have been required by its contract to defend such a suit in any case, and that the suit could have gone either way with regard to the status of these employees.

The court went on to observe that the policy explained what Mr. King could have done to exclude his workers from the protections of the policy (such as by requiring his subcontractors to obtain certificates of insurance or by having workers fill out I-18 forms), that Mr. King did not take those actions, and that as a result, the insurer was left exposed to the risks involved in covering those workers. The court accordingly granted CNA a judgment for the premium amount of $14,790, as well as prejudgment interest of $4,001.52. The court's decision was memorialized in an order dated November 19, 2004. This appeal followed.

### III. THE WORKERS COMPENSATION LAW

The purpose of the Workers Compensation Law, Tenn. Code Ann. § 50-6-101 *et seq.*, is to provide a reliable and equitable remedy to workers who are injured on the job, while limiting the liability to which the employer is exposed. *See Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 443 (Tenn. 1984); *Sasser v. Averitt Express*, 839 S.W.2d 422, 429 (Tenn. Ct. App. 1992) . To achieve that purpose, every employer whose operations fall within the scope of the Law is required to maintain a policy of insurance to secure any possible workers compensation liability or, in the alternative, to meet stringent financial requirements in order to establish and maintain the status of a self-insured employer. Tenn. Code Ann. § 50-6-405.

Generally, only employers with five or more employees are required to provide workers compensation coverage for their employees. Tenn. Code Ann. § 50-6-106(5). However, this limitation does not apply to the construction industry, perhaps because of the dangers arising in many construction trades and because many small contractors employ fewer than five workers. Tennessee Code Annotated § 50-6-113(f)(1) provides that ". . . any person engaged in the construction industry, including principal contractors, intermediate contractors, or subcontractors, shall be required to carry workers' compensation insurance. This requirement shall apply whether or not the person employs fewer than five (5) employees. Sole proprietors and partners shall not be required to carry workers' compensation insurance on themselves . . . ."

The existence of an employer-employee relationship has been said to be a primary requirement for employer liability under the Workers Compensation Law. *Murray v. Goodyear Tire & Rubber Co.* 46 S.W.3d 171, 175 (Tenn. 2001). *Stratton v. United Inter-Mountain Telephone*, 695 S.W.2d 947, 950 (Tenn. 1985). However, under Tenn. Code Ann. § 50-6-113(a), an employer may be held liable for injuries sustained by employees of his subcontractors, even when those subcontractors are deemed to be independent contractors. *Murray*, 46 S.W.3d at 175.

Tennessee Code Annotated § 50-6-113 reads in pertinent part,

(a) A principal or intermediate contractor, or subcontractor shall be liable for compensation to any employee injured while in the employ of any of the subcontractors of the principal, intermediate contractor, or subcontractor and engaged upon the subject matter of the contract to the same extent as the immediate employer. ...
(d) This section applies only in cases where the injury occurred on, in, or about the premises on which the principal contractor has undertaken to execute work or that are otherwise under the principal contractor's control or management.

The above statute is said to create "statutory employers" in situations where an injured worker cannot recover compensation from an immediate employer. The statute's purpose is "to protect employees of irresponsible and uninsured subcontractors by imposing ultimate liability on the presumably responsible principal contractor, who has it within his power, in choosing subcontractors, to pass upon their responsibility and insist upon appropriate compensation for their workers." *Murray,* 46 S.W.3d at 175 (Tenn. 2001)(quoting *Brown v. Canterbury Corp*., 844 S.W.2d 134, 136 (Tenn. 1992)).

Tennessee Code Annotated § 50-6-113 must be understood as an integral part of the comprehensive scheme established by the Workers Compensation Law. The law's goal of providing broad coverage for injured workers cannot be achieved without a reliable system to pass responsibility up the line if lower level employers or subcontractors do not carry the required insurance. In the case before us, the general contractor required the subcontractors, such as Mr. King, to carry workers compensation insurance. Mr. King could have imposed a similar requirement on any subcontractors he used.

## IV. Is the Contract Enforceable?

An insurance policy is a contract whereby for a stipulated consideration one party promises to compensate the other for losses due to specified risks. *See Black's Law Dictionary* (5th Ed. 1979); Tenn. Code Ann. § 56-7-101. Insurance policies are subject to the same rules and principles that are used to construe other contracts. *Massachusetts Mutual Life Insurance Co. v. Jefferson*, 104 S.W.3d 13, 20 (Tenn. Ct. App. 2002). As long as a policy's terms are unambiguous, they will be enforced as written. *Allstate Insurance Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991). Additionally, the provisions of the Workers Compensation Law must be read into every policy of workers compensation insurance. *See General Guaranty Insurance Co. v. Scudginton*, 376 S.W.2d 464, 466 (Tenn. 1964).

Mr. King acknowledges that he signed the application for insurance, but testified that he had not read the policy and was not interested in any of its details. The law has long been settled that "in the absence of fraud or mistake, an insured cannot claim that he is not bound by the contract of insurance, or certain provisions thereof, because he has not read it, or is otherwise ignorant of, or unacquainted with its provisions." *Webber v. State Farm Mutual Auto Insurance Co.*, 49 S.W.3d 265, 274 (Tenn. 2001)(quoting *General American Life Insurance Co. v. Armstrong*, 185 S.W.2d 505, 507 (Tenn. 1945)). Further, "the insured is conclusively presumed to have knowledge of, and to have assented to, all the terms, conditions, limitations, provisions or recitals in the policy, irrespective of whether the insured actually read, or could read, the insurance contract." *Ibid.;see also, De Ford v. National Life & Accident Ins. Co.*, 185 S.W.2d 617, 621-22 (Tenn. 1945) (recognizing and applying the same rule, even when the insured could not read the contract).

A considerable amount of trial testimony was devoted to examining Mr. King's application for insurance and to the question of who was responsible for the inaccurate information contained in the document. We note that an application for insurance is considered to be an unconditional request for coverage effective immediately upon acceptance by the company. *Corbitt v. Federal Kemper Insurance Co.*, 594 S.W.3d 728, 729 (Tenn. Ct. App. 1980). Once accepted, the application is incorporated into the policy.

Mr. King argues that in light of all the material misrepresentations on his application, there was no meeting of the minds, and thus that the insurance policy was void *ab initio*.[5] This argument does not stand up to scrutiny, however, for by signing the application, Mr. King was vouching for the accuracy of the information it contained. The trial court correctly concluded that such an

---

[5] To support his argument, Mr. King cites this court's opinion in the case of *Consumers Insurance USA v. Smith,* No. E2002-00724-COA-R3-CV, 2002 WL 31863300 (Tenn. Ct. App. Dec. 23, 2002)(no Tenn. R. App. P. 11 application filed). In a single sentence of that opinion, we spoke of an automobile insurance contract as being void *ab initio*. Our use of that term was unfortunate and obviously inadvertent, because the central holding of that case was that when an applicant for insurance makes a material misrepresentation with the intent to deceive or which increases the risk of loss to the insurer, the policy is *voidable at the insurer's option*. The same principal is operative here. Mr. King's misrepresentations might have given CNA grounds to void the policy, but under the circumstances of this case, he cannot disclaim his contractual obligations.

argument violated the well-established rule that a party may not attempt to avoid a contract by taking advantage of his own wrong. *See Dodson by Dodson v. Shrader,* 824 S.W.2d 545, 547 (Tenn. 1992); *Brown v. Ogle*, 46 S.W.3d 721, 727 (Tenn. Ct. App. 2000); *Morat v. State Farm Mutual Auto Insurance Co.*, 949 S.W.2d 692, 696 (Tenn. Ct. App. 1997). Accordingly, CNA is entitled to enforce the policy against Mr. King.

## V. THE PREMIUM CALCULATION

Since the insurance agreement is enforceable by CNA, the question becomes whether CNA is entitled to the premium as calculated through its audit. A premium is the consideration for an insuror agreeing to assume a specified risk, and the amount of the premium is related to the magnitude of the risk involved.

The policy herein stated that the final premium amount would not be determined until the end of the policy period. The reason for this provision, which is a standard feature of workers compensation policies, is that any number of employees may be hired or terminated while the policy is in effect, thus increasing or decreasing the amount of risk to which the insurer is exposed.

Thus, Mr. King's payment of the minimum premium and his declaration that he had no employees did not cut off the insurer's right to assess a retrospective premium, based upon the true degree of risk it faced. The premium rate of $32.77 for each $100 of worker remuneration was set out in the policy, as was the insurer's right to conduct a retrospective audit.[6] Mr. King agreed to pay a premium based on a specified rate applied to the premium base. The issue in this case is whether the correct base was used.

The policy stated that the premium was based on remuneration to Mr. King's employees and to "all other persons engaged in work that could be make us liable under the policy." It also stated that payroll records or the contract price of services from those persons could be used to calculate the remuneration. Obviously, this language was included because of the statutory employer liability established in Tenn. Code Ann. § 50-6-113. CNA concluded that this language included the two workers who worked directly for Mr. King as well as the workers used by Mr. Munoz. The July 31, 2002, letter from CNA made that position even clearer, stating that the "payroll for uninsured subcontractors" would be included in the premium base.

It was and is CNA's position that if a worker employed by one of Mr. King's subcontractors, or the two "subcontractors" who did not file I-18s, had filed a claim after an injury on the job, CNA would have had to defend against the claim, to bear the risk that the worker would be found to be a statutory employee under Tenn. Code Ann. § 50-6-113, and to pay whatever benefits the worker

---

[6]The policy specifically gave the insured the right of cancellation at any time upon written notice. Thus, Mr. King could have cancelled the policy if he found the premium rate unsatisfactory. He also could have required any subcontractor he hired to furnish insurance for that subcontractor's workers, thus eliminating their pay from the basis used to calculate his final premium.

was entitled to. Thus, as the trial court found, CNA assumed the risk to defend any claim brought by a worker on the job site even if that defense was to prove the injured worker was an independent contractor.

Both the policy and the letter explained how Mr. King could avoid having payments to such workers included in the premium base: by providing evidence that the subcontractor had workers compensation insurance or was not subject to the Workers Compensation Laws and that all appropriate forms had been filed. Mr. King did not provide CNA with evidence of any of these circumstances.[7]

It is clear that, by the terms of the policy itself, CNA was justified in including in the premium base the amounts paid by Mr. Munoz to his workers on the King job. CNA explained it would include those amounts, and Mr. King did not provide the information that would have excluded them. Based purely on contract principles, Mr. King would be liable for the additional premium.

The issue in this case is whether CNA was entitled to the premium it claimed. In the contract of insurance, Mr. King agreed to pay a premium as set out therein. The premium was calculated in accordance with the policy's explanation. Accordingly, we conclude that CNA proved its entitlement to the additional premium.

However, because Mr. King's primary argument is focused on another issue, we will discuss that argument.

## VI. INDEPENDENT CONTRACTORS OR STATUTORY EMPLOYEES?

Mr. King's central argument on appeal is that the workers whose remuneration CNA used to calculate his insurance premium were independent contractors, not his employees. He contends that as such their status renders him exempt from any responsibility to insure them. In other words, he argues that they are not "other persons engaged in work that could make [CNA] liable under Part One (Workers Compensation Insurance) of this policy."

As we indicated earlier, the Workers Compensation Law requires all contractors engaged in the construction industry, even those who employ fewer than five workers, to obtain coverage for their employees. Tenn. Code Ann. § 50-6-113(f)(1). It also creates liability for injuries to subcontractor employees when the subcontractor does not have insurance.

---

[7]The trial court discussed the policy provisions in detail and concluded that the insurance company had drafted language that required Mr. King to come forward with proof that his subcontractors' workers were not statutory employees before any workers compensation suit, which the company would be required to defend, was filed.

Because of this last provision, when a worker submits a claim under the Workers Compensation Law, our courts are often called upon to determine whether or not the claimant is eligible to recover under the law as a statutory employee. Since no injury claim was filed in this case, the trial court was not required to make a definitive determination as to the legal status of the workers involved, and the court specifically recognized that that question was close under the facts of this case.[8] It also noted that CNA would have been required to defend any suits by the workers had they been injured during the period the policy was enforced.

When an injured worker files a claim for a workplace injury, the burden of proving that the worker is an independent contractor rather than an employee rests on the employer. *Galloway v. Memphis Drum Service*, 822 S.W.2d 584, 586 (Tenn. 1991); *Jones v. Crenshaw*, 645 S.W.2d 238, 240 (Tenn. 1983). *Cromwell General Contractors v. Lytle*, 439 S.W.2d 598 (Tenn. 1969). Where there is any doubt as to whether the worker is an employee or an independent contractor, the doubt must resolved in favor of the former. *Seals*, 327 S.W.2d at 44.

Both parties have cited this court's opinion in *Royal Insurance v. R & R Drywall*, No. M2002-00791-COA-R3-CV, 2003 WL 21302983 (Tenn. Ct. App. June 6, 2003)(no Tenn. R. App. P. 11 application filed), and we agree that it is relevant to the issues herein. CNA insists that the controlling principles in that case were the same as in the present case, and that they require the court to grant judgment to the insurance company. Mr. King argues that the factual distinctions between that case and this one invalidate any such conclusion.

As in the present case, *Royal Insurance v. R & R Drywall* involved a retrospective premium assessed against a general contractor by a workers compensation carrier after an audit of the contractor's books revealed that its subcontractors employed workers that the general contractor had not declared. The general contractor argued that these additional workers were not employees, but members of *de facto* partnerships.[9] In support of this argument, the contractor noted that all the workers executed I-18 forms and hand-written statements declaring that they were partners who split the proceeds which the lead partner received from the general contractor.

---

[8]In its oral findings from the bench, the trial court stated that the issue was not "clear-cut" and it would have taken a lawsuit to establish whether such workers were independent contractors or statutory employees. The court noted that, in this situation, such a lawsuit would not have been frivolous, because it "could arguably have gone either way with regard to the status of these employees." Nonetheless, the court also found "as a finding of fact" that the workers of Mr. King's subcontractors were independent contractors. Mr. King has reminded us of this finding. However, when the facts are essentially undisputed, whether or not an individual is an independent contractor is a question of law for the trial court rather than a question of fact. *Stratton*, 695 S.W.2d at 953; *Seals v. Zollo,* 327 S.W.2d 41, 44 (Tenn. 1959). Unlike findings of fact by the trial court, its conclusions of law are reviewed on appeal *de novo*, without any presumption of correctness. *See* Tenn. R. App. P. 13(d); *Sallee v. Barrett*, 171 S.W.3d 822, 825 (Tenn. 2005); *Phillips v. A&H Const. Co., Inc.*, 134 S.W.3d 145, 149 (Tenn. 2004).

[9]Sole proprietors and partners are not required to carry workers compensation insurance on themselves. Tenn. Code Ann. § 50-6-113(f).

-10-

This court noted, however, that all the documents the general contractor relied upon had been executed after the audit and the assessment of the additional premium. We determined this post-policy material was not convincing because if one of those workers had been injured on the job during the policy period, he would have had little incentive at that time to waive his rights to workers compensation benefits and the insurer's obligation of payment. Our reasoning, as set out in the following passage, applies with equal force to the present case:

> We thus see the contractor as trying to have it both ways. During the disputed policy period, when it was still possible that one of the drywall "partners" could have injured himself on the job, R & R could have invoked the protections of the workers' compensation law and of its policy. Now that the policy period has passed with no claims having been filed, the contractor argues that the workers had no coverage under its policy, and therefore that it should not have to pay an additional premium. As the trial court points out, "[t]he audit to determine the current premium was intended to examine the actual risk which Royal Insurance undertook during the policy period, not a risk which was defined only after the policy period ended."

*Royal Insurance v. R & R Drywall,* 2003 WL 21302983, at *4.

In that opinion we also relied upon Tenn. Code Ann. § 50-6-114(a), which reads in pertinent part, "[n]o contract or agreement, written or implied, or rule, regulation or other device, shall in any manner operate to relieve any employer, in whole or in part, of any obligation created by this chapter." After discussing the documents created after the coverage period, we concluded that they constituted just such a device used to avoid a premium associated with a risk that had since closed.

Mr. King argues that the workers at issue herein were independent contractors and, thus, CNA bore no risk with regard to them. He refers us to Tenn. Code Ann. § 50-6-102(11), which sets out a list of factors for the courts to consider when called upon to distinguish between employees on the one hand and subcontractors or independent contractors on the other. Many of these factors involve the degree of control that the employer can exercise over its workers. *Masiers v. Arrow Transfer & Storage Co.*, 639 S.W.2d 654, 656 (Tenn. 1982). However, "[i]n determining whether one is an independent contractor or an employee, the vital test is not whether the right to control was exercised, but whether it existed." *Jones*, 645 S.W.2d at 240-241; *Stratton*, 695 S.W.2d at 953. Mr. King and Mr. Munoz both testified that they exercised no control over the manner in which the roofing work was performed, but there was no evidence that they did not have the right to control such work if they wished.

From the record as a whole, it appears to us that Mr. King wished to avoid the expense involved in furnishing workers compensation insurance for roofers who worked on his jobs, but that he was required by the contractor for this project to provide such insurance. To achieve the end of low premiums, he first stated he had no employees, did not use subcontractors, and did not sublet without proof of insurance. He also tried to establish informal agreements with subcontractors that would give the appearance of a hands-off approach.

Certainly, Mr. King and Mr. Munoz claimed a remarkable degree of non-involvement with the work for which each was getting paid. This court is not inclined to give its imprimatur to such a device as a way of avoiding workers compensation liability because it would be contrary to the purpose of the Workers Compensation Law "to insure as far as possible to all workers payment of benefits when they [are] injured in the course of their employment." *Stratton*, 695 S.W.2d at 951.

In the case before us, however, the question is not whether Mr. King sufficiently distanced himself from the workers and the work to be able to avoid responsibility as a statutory employer. Instead, it is whether he is liable for the premium assessed. CNA told him in the policy what workers would be included in the premium base as "other persons engaged in work that **could** make CNA liable . . . ."

If any of the workers had been injured on the job, they could have submitted a claim for workers compensation that Mr. King would have had to answer as the arguable employer or statutory employer of those workers. As his insurer, CNA undertook this risk during the policy period. It should be noted that Mr. King notified CNA of an injury after the policy period, apparently expecting coverage.

There were other methods he could have used to reduce the size of the premium that was assessed. The policy itself allowed him to avoid paying a premium for subcontractors' payroll or payment for services to workers "if you give us proof that the employers of these persons lawfully secured their workers compensation obligation." He could have required that his subcontractors carry workers compensation insurance. He also could have asked everyone who worked for him or his subcontractors to execute I-18 forms, thereby strengthening the argument that no workers compensation insurance was required of them.[10]

Since he took none of these actions, the insurance company was obligated under the policy to defend at its own expense any claim against Mr. King arising from injury to those working for him or his subcontractors and to pay benefits for those injuries, if such was required. The premium was assessed on the basis of the potential magnitude of that obligation.

---

[10]Mr. King notes that in September of 2004 the Tennessee Department of Labor discontinued the use of I-18 forms for a number of reasons, including inaccurate reporting and "use of the form to show non-coverage by workers who should probably be covered as employees rather than subcontractors when the criteria set forth in Tenn. Code Ann. § 50-6-102(11) are applied." He argues that the Department's action renders his workers' failures to execute I-18 forms inconsequential and strengthens his argument that they are independent contractors, based upon the statutory factors. However, it is not at all clear to us that the elimination of the I-18 form in 2004 would have appreciably reduced the risk to the insurer in 2001.

## VII. Conclusion

The judgment of the trial court is affirmed.  The case is remanded to the Circuit Court of Cheatham County.  Costs on appeal are taxed to the appellant, William King.


_____
PATRICIA J. COTTRELL, JUDGE